ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Thursday, February 27, 2025 4:04:12 PM
CASE NUMBER: 2024 CV 03258 Docket ID: 105411313
Mike Foley
CLERK OF COURTS MONTGOMERY COUNTY OHIO

IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO
GENERAL DIVISION

| | | |
|---|---|---|
| **THE CONNOR GROUP, A REAL ESTATE INVESTMENT FIRM, LLC** | : | Case No.  2024 CV 03258 |
| 10510 SPRINGBORO PIKE | : | |
| MIAMISBURG, OH 45342 | : | JUDGE E. GERALD PARKER, JR. |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | **<u>AMENDED COMPLAINT</u>** |
| | : | |
| **JENNIFER MORENO** | : | **(INJUNCTIVE RELIEF REQUESTED)** |
| 6650 17th WAY NORTH | : | |
| ST. PETERSBURG, FL 33702 | : | |
| | : | |
| and | : | |
| | : | |
| **TINA AUSTIN** | : | |
| 1793 WALKER RIDGE DR. SW | : | |
| MARIETTA, GA 30064 | : | |
| | : | |
| and | : | |
| | : | |
| **MEGAN HEDRICK** | : | |
| 8644 TESSARA LANE | : | |
| TAMPA, FL 33647 | : | |
| | : | |
| and | : | |
| | : | |
| **CHESLEY LEWIS** | : | |
| 8305 SPITFIRE TRAIL | : | |
| AUBREY, TX 76227 | : | |
| | : | |
| and | : | |
| | : | |
| **HA VO A/K/A MARC VO** | : | |
| 1238 HERMITAGE AVENUE | : | |
| CLEARWATER, FL 33764 | : | |

|                                                                                                                       |     |
|-----------------------------------------------------------------------------------------------------------------------|-----|
|                                                                                                                       | :   |
| and                                                                                                                   | :   |
|                                                                                                                       | :   |
| **JENNIFER NELSON**                                                                                                   | :   |
| 11208 MARVELWOOD ROAD                                                                                                 | :   |
| WEEKI WACHEE, FL 34614                                                                                                | :   |
|                                                                                                                       | :   |
| and                                                                                                                   | :   |
|                                                                                                                       | :   |
| **HIGHER TECH REALTY FL, LLC**                                                                                        | :   |
| **D/B/A MARK SPAIN REALTY**                                                                                           | :   |
| c/o CT CORPORATION SYSTEM                                                                                             | :   |
| 1200 SOUTH PINE ISLAND ROAD                                                                                           | :   |
| PLANTATION, FL 33324                                                                                                  | :   |
|                                                                                                                       | :   |
|                                                                                                                       | :   |
|                                                                     Defendants.                                       | :   |

Plaintiff The Connor Group, A Real Estate Investment Firm, LLC ("The Connor Group"), for its Complaint against Defendants Jennifer Moreno ("Moreno"), Tina Austin ("Austin"), Megan Hedrick ("Hedrick"), Chesley Lewis ("Lewis"), Ha Vo a/k/a Marc Vo ("Vo"), Jennifer Nelson ("Nelson")(collectively, the "Individual Defendants") and Higher Tech Realty Florida, LLC, d/b/a Mark Spain Realty ("Mark Spain") (collectively, "Defendants"), states as follows:

## NATURE OF THE ACTION

1.      This action arises as a result of actions taken by Defendants to unlawfully compete and interfere with the business of The Connor Group in violation of their contractual restrictions.

2.      The Connor Group brings this suit against Defendants for: Injunctive Relief, Breach of Contract, Tortious Interference, Civil Conspiracy, and Costs and Attorney's Fees.

## PARTIES, VENUE, AND JURISDICTION

3.      The Connor Group is an Ohio limited liability company with its headquarters in Montgomery County, Ohio. The Connor Group is a real estate investment firm that engages in the business of management of apartment communities, including but not limited to, communities in

Atlanta, Georgia; Austin, Dallas, and San Antonio, Texas; Charlotte and Raleigh-Durham, North Carolina; Chicago, Illinois; Phoenix, Arizona; Denver, Colorado; Indianapolis, Indiana; Louisville, Kentucky; Miami and Tampa, Florida; Minneapolis and St. Paul, Minnesota; Cincinnati, Columbus, and Dayton, Ohio; and Nashville, Tennessee.

4.     Moreno, Austin, Hedrick, Lewis, Vo, and Nelson are all former employees of The Connor Group who now work with Mark Spain.

5.     Upon information and belief, Mark Spain has registered entities in multiple states, including one in Ohio, who are all affiliated with Mark Spain Real Estate.

6.     Higher Tech Realty Florida, LLC is a Florida limited liability company, which conducts its business under the name of Mark Spain Real Estate.

7.     Upon information and belief, Mark Spain operates from its headquarters located in Alpharetta, Georgia. Mark Spain engages in the business of real estate sales in communities located throughout the United States, including but not limited to, communities in Fort Worth and Dallas, Texas; Greenville, South Carolina; Raleigh, Charlotte, and Greensboro, North Carolina; Alpharetta, Atlanta, Athens, Buford, Marietta, and Stockbridge, Georgia; Tampa, Orlando, and Jacksonville, Florida; and Nashville, Tennessee.

8.     Jurisdiction and venue of this action is proper in this Court and multiple Agreements between the parties provides for the application of Ohio law.

9.     This Court has personal jurisdiction over the Defendants under R.C. 2307.382 (the Ohio Long Arm Statute) because, inter alia, the Defendants transacted business in this State and the exercise of jurisdiction over the Defendants is consistent with the Ohio Constitution and the United States Constitution. By accepting employment with The Connor Group (an Ohio business entity) and receiving quarterly training in Ohio on an annual basis, the Individual Defendants

purposefully availed themselves of the privilege of acting in Ohio and maintain sufficient minimum contacts with Ohio. Additionally, the causes of action herein arise from and are substantially related to Defendant's Ohio-related activities such that exercising jurisdiction is reasonable under the circumstances.

10.     Venue is proper under Civ. R. 3(C)(3, 6, and 7) because the Defendants conducted activity in Montgomery County, Ohio that gave rise to the claim for relief, Montgomery County is the county in which all or part of the claim for relief arose, and Plaintiff resides in this county.

## GENERAL FACTUAL ALLEGATIONS

### Individual Defendants

11.     Moreno was employed by The Connor Group as a Senior Regional Manager and Sales Trainer from May 18, 2015 through December 5, 2023. As a Senior Regional Manager and Sales Trainer, Moreno was responsible for managing the training of The Connor Group's employees and overseeing the management of The Connor Group's properties located in the Tampa, Florida market.  Prior to her resignation, Moreno regularly led monthly classroom training for other Connor Group employees while at Connor Group headquarters in Montgomery County, Ohio. Moreno remained in the Senior Regional Manager and Sales Trainer position until she voluntarily resigned her employment.

12.     Austin was employed by The Connor Group as the Southeast Executive Assistant from June 15, 2009 through March 15, 2024. As the Southeast Executive Assistant, Austin was responsible for managing financial and occupancy objectives, designing and implementing marketing strategies, analyzing reports and financials to determine areas of growth or concern, increasing revenue, positioning properties for successful sales, increasing occupancy, training new

associates, and managing vendors and contractors for repairs and maintenance. Austin remained in the Southeast Executive Assistant position until she voluntarily resigned her employment.

13.    Hedrick was employed by The Connor Group as a General Manager from December 1, 2020 through March 7, 2024. As a General Manager, Hedrick was responsible for managing the Mezzo of Tampa Palms, a Connor Group property located in Tampa, Florida. Hedrick held the following duties, including but not limited to, managing the property's financial and occupancy objectives, designing and implementing marketing strategies, analyzing reports and financials to determine areas of growth or concern, increasing revenue, increasing occupancy, and training new associates. Hedrick remained in the General Manager position until she voluntarily resigned her employment.

14.    Lewis was employed by The Connor Group as a Property Manager from May 18, 2015, through April 15, 2024. As Property Manager, Lewis held the following duties, including but not limited to, managing the property's financial and occupancy objectives, designing and implementing marketing strategies, analyzing reports and financials to determine areas of growth or concern, increasing revenue, increasing occupancy, and training new associates. Lewis remained in the Property Manager position until she voluntarily resigned her employment. Lewis began working for Mark Spain on or around May of 2024.

15.    Vo became employed by The Connor Group as a Senior Manager on November 2, 2020. As a Senior Manager, Vo was responsible for managing The Boulevard, a Connor Group property located in Tampa, Florida. As a Senior Manager, Vo had the following duties, including but not limited to, managing the property's financial and occupancy objectives, designing and implementing marketing strategies, analyzing reports and financials to determine areas of growth or concern, increasing revenue, increasing occupancy, and training new associates. Vo signed an

employment agreement with Mark Spain on June 10, 2024, and resigned from TCG on June 7, 2024.

16.     Nelson became employed by The Connor Group as a Training Director on March 2, 2020. As the Training Director, Nelson was responsible for managing the training of The Connor Group's employees and overseeing the management of The Connor Group's properties located in the Denver, Colorado market. Nelson had the following duties, including but not limited to, managing the property's financial and occupancy objectives, designing and implementing marketing strategies, analyzing reports and financials to determine areas of growth or concern, increasing revenue, increasing occupancy, and training new associates. Nelson signed an employment agreement with Mark Spain on June 10, 2024, and resigned from TCG on June 7, 2024.

17.     As a condition of employment with The Connor Group, each of the Individual Defendants entered into an Employment Agreement with The Connor Group (collectively, the "Agreements") attached hereto as **Exhibit 1**.

18.     In paragraph 5 of the Agreements, Moreno, Hedrick, Lewis, Vo, and Nelson agreed that, during employment with The Connor Group and for a period of two years after separation from employment, the Individual Defendants would not compete with The Connor Group anywhere within a 50-mile radius of any property owned or managed by The Connor Group or any of its affiliated entities.

19.     In paragraph 6 of the Agreements, Moreno, Hedrick, Lewis, Vo, and Nelson agreed that during their employment and after separation from employment, the Individual Defendants would "not, directly or indirectly, solicit or participate in the solicitation" of The Connor Group's

associates "for the purpose of inducing them to leave the employ of [The Connor Group] or to become employed by another entity."

20.    In paragraph 3 of the Agreements, Moreno, Hedrick, Lewis, Vo, and Nelson acknowledged that they would be given access to and become acquainted with certain confidential information, proprietary information, and trade secrets relating to the business of The Connor Group.

21.    Moreno, Hedrick, Lewis, Vo, and Nelson further agreed, pursuant to paragraph 3 of the Agreements, that they would not reveal, disclose, or use confidential information, proprietary information, and trade secrets of The Connor Group, including but not limited to, the following: that related to The Connor Group's systems, policies, procedures, manuals, forms, seminar materials, financial records, reports, financial plans, contracts, customer lists and information, vendor lists, vendor pricing and information, and marketing/customer retention strategies.

22.    Paragraphs 3, 4, and 5 of Austin's Agreement also contain non-solicitation, non-competition, and confidentiality provisions which slightly differs from the other Individual Defendants' Agreements and is governed by Georgia law.

23.    The Individual Defendants came to The Connor Group with absolutely no experience in the real estate investment and property management industries.

24.    During the Individual Defendants' employment, The Connor Group invested extensive time and expense in training the Individual Defendants in the real estate investment and property management industries. This included a substantial amount of time training the Individual Defendants in The Connor Group's most important, proprietary, and confidential aspects of the business. Some of the Individual Defendants' training took place in Montgomery County, Ohio on

a quarterly basis each year, and the Individual Defendants also regularly travelled to this jurisdiction for events and meetings during their employment.

25.     At the time the Individual Defendants left their employment or offered their notice of resignation, the Individual Defendants had broad access to confidential and proprietary information of The Connor Group, including but not limited to, its resident lists, rental unit pricing, apartment renewal lists, the proprietary underwriting process and considerations, and confidential financial data.

26.     After offering their notice of resignation or leaving their employment with The Connor Group, The Connor Group learned that it was the intent of the Individual Defendants to commence working for Mark Spain.

27.     Upon information and belief, Mark Spain is a competitor of The Connor Group that owns and/or manages real estate offices in markets in which The Connor Group operates, including but not limited to, Tampa, Florida; Dallas, Texas; Charlotte, North Carolina; Atlanta, Georgia; and Nashville, Tennessee. Mark Spain and TCG both compete for the same potential housing customers in the same markets and Mark Spain's website states they are in the business of offering residential real estate.

28.     Upon information and belief, the Individual Defendants' employment with Mark Spain involves positions and duties substantially similar to the position and duties the Individual Defendants most recently performed for The Connor Group and involves the Individual Defendants managing real estate offices located within a 50-mile radius of The Connor Group's properties.

29.     Upon learning of the Individual Defendants' resignation of employment from The Connor Group and employment with Mark Spain, The Connor Group became aware of several

current and former employees of The Connor Group directly or indirectly solicited by the Individual Defendants to leave employment with The Connor Group and become employed with Mark Spain.

30.     Upon information and belief, the Individual Defendants directly or indirectly solicited one another to resign their employment from The Connor Group and become employed with Mark Spain.

31.     One or more of the Individual Defendants texted The Connor Group's employees about them also leaving The Connor Group and working for Mark Spain.

32.     One or more of the Individual Defendants arranged in person meetings or dinners with one another where they spoke to The Connor Group's employees about leaving The Connor Group and working for Mark Spain.

33.     One or more of the Individual Defendants sent open job positions at Mark Spain to the other Individual Defendants, while they were still working at The Connor Group.

34.     One or more of the Individual Defendants sent Mark Spain onboarding paperwork and/or personality or behavioral assessments to The Connor Group's employees while they were still employed at The Connor Group.

35.     One or more of the Individual Defendants sent the LinkedIn profiles of The Connor Group's employees to other Defendants as a potential candidate for Mark Spain to hire.

36.     One or more of the Individual Defendants knew they were breaching their Agreements.

37.     One or more of the Individual Defendants attempted to hide their actions from The Connor Group.

38.     One or more of the Individual Defendants told The Connor Group's employees to hide what they were doing from The Connor Group.

39.     At the time of their solicitations, the Individual Defendants had knowledge of the non-solicitation and confidentiality provisions contained in their own Agreement and the Agreements of the other Individual Defendants.

40.     Upon learning of the Individual Defendants' solicitations of former and current employees of The Connor Group, including one another, The Connor Group advised Moreno, Austin, Hedrick, Vo, and Nelson in writing of The Connor Group's intent to seek enforcement of the Agreements if the Individual Defendants continued their solicitations of current and former employees of The Connor Group. A true and accurate copy of the letters to Moreno, Austin, Hedrick, Vo, and Nelson, dated May 29, 2024, is attached hereto as **Exhibit 2.**

41.     Despite The Connor Group's efforts and communications with the Individual Defendants, the Individual Defendants failed to offer any reassurance that they would comply with the terms of their Agreements and cease solicitation of The Connor Group's current and former employees.

42.     Upon information and belief, the Individual Defendants continued to solicit current and former employees of The Connor Group to leave their employment with The Connor Group and become employed with Mark Spain after receiving their letter from The Connor Group.

43.     The Individual Defendants' solicitations of current and former employees of The Connor Group is in direct violation of their Agreements. Upon information and belief, violations of the other provisions of the Agreements listed above are inevitable, if they have not occurred already.

44. As a result, The Connor Group seeks appropriate and necessary relief against the Individual Defendants, including injunctive relief requiring the Individual Defendants to abide by the Agreements and damages to compensate The Connor Group for any and all past breaches of the Agreements.

45. Additionally, because paragraph 13 of Moreno, Hedrick, Lewis, Vo, and Nelson's Agreements and paragraph 9 of Austin's Agreement entitles The Connor Group to recover all costs and attorney's fees it incurs as a result of the Individual Defendants' breach of the Agreements, The Connor Group seeks its costs and attorney's fees.

**Mark Spain**

46. Upon information and belief, Mark Spain is a competitor of The Connor Group that owns and/or manages real estate offices in markets in which The Connor Group operates, including but not limited to, Tampa, Florida; Dallas, Texas; Charlotte, North Carolina; Atlanta, Georgia; and Nashville, Tennessee. Mark Spain and TCG both compete for the same potential housing customers in the same markets and Mark Spain's website states they are in the business of offering residential real estate.

47. On May 29, 2024, The Connor Group, through counsel, contacted Mark Spain and informed Mark Spain that five of The Connor Group's former, or current, employees had resigned and are now believed to be working, or planning to work, for Mark Spain in either Tampa, Florida or Atlanta, Georgia.

48. The Connor Group's correspondence to Mark Spain identified the non-solicitation, non-competition, and confidentiality provisions set forth in the Agreements, thereby placing Mark Spain on notice of their terms.

49.     The Connor Group's correspondence to Mark Spain warned against Mark Spain engaging in tortious interference with The Connor Group's contract rights. A true and accurate copy of this correspondence, dated May 29, 2024, is attached as **Exhibit 3.**

50.     Although Mark Spain, through counsel, informed The Connor Group that she would respond to The Connor Group's correspondence, Mark Spain did not offer any reassurance that it will cease encouraging and assisting the Individual Defendants' in their efforts to directly or indirectly solicit current or former employees of The Connor Group to leave their employment with The Connor Group and become employed with Mark Spain.

51.     Upon information and belief, after delivering The Connor Group's correspondence to Mark Spain, Mark Spain continued to assist and encourage the Individual Defendants to solicit, directly or indirectly, current and former employees of The Connor Group to leave their employment with The Connor Group and become employed with Mark Spain.

52.     As a result, The Connor Group seeks appropriate and necessary relief against Mark Spain, including a preliminary and permanent injunction requiring Mark Spain to cease interfering with the Individual Defendants' Agreements.

## <u>COUNT I</u>
### Breach of Contract (As to Individual Defendants)

53.     The Connor Group re-alleges and incorporates the preceding paragraphs as if fully restated here.

54.     The Connor Group has valid and binding contracts with the Individual Defendants. *See* **Exhibit 1**.

55.     The Connor Group performed all of its obligations under the Agreements.

56.    As set forth herein, the Individual Defendants materially breached and continue to materially breach one or more of the following terms in the Agreements: 1) the non-solicitation provisions, 2) the non-competition provisions, and 3) the confidentiality provisions. **Exhibit 1**.

57.    The Connor Group has numerous legitimate business interests justifying the restrictions contained in the Agreements, including but not limited to, preventing unfair competition and protecting its Confidential Information.

58.    The restrictions in the Agreements are reasonably necessary to protect the legitimate business interests of The Connor Group.

59.    As a direct and proximate result of the Individual Defendants' breach of the Agreements, The Connor Group has suffered and continues to suffer damages in an amount to be proven at trial, as well as other irreparable harm for which it has no adequate remedy at law.

## COUNT II
### Tortious Interference with Contract (As to Defendants)

60.    The Connor Group re-alleges and incorporates the preceding paragraphs as if fully restated here.

61.    Pursuant to the Agreements, the Individual Defendants agreed that during their employment and after separation, the Individual Defendants would "not, directly or indirectly, solicit or participate in the solicitation" of The Connor Group's associates "for the purpose of inducing them to leave the employ of [The Connor Group] or to become employed by another entity." *See* **Exhibit 1**.

62.    Mark Spain knew of the Agreements between The Connor Group and the Individual Defendants.

63.    Mark Spain intentionally interfered with the Agreements, causing the Individual Defendants to breach the Agreements with The Connor Group.

64. Mark Spain has no justification for its interference with the Agreements.

65. The Individual Defendants have knowledge of the Agreements between the Individual Defendants and The Connor Group, including the non-solicitation provisions, non-competition provisions, and the confidentiality provisions.

66. Upon information and belief, the Individual Defendants have encouraged and assisted one another in the solicitation of current and former employees of The Connor Group, including each other, to leave their employment with The Connor Group and become employed with Mark Spain.

67. Despite knowledge of the Agreements, the Individual Defendants have intentionally interfered with the Agreements of the other Individual Defendants, causing the breach of the Agreements with The Connor Group.

68. The Individual Defendants engaged in solicitation of The Connor Group's employees both before and after their departure from The Connor Group.

69. The Individual Defendants have no justification for their interference with the Agreements.

70. As a direct and proximate result of Defendants' conduct, The Connor Group has been damaged in an amount to be proven at trial but believed to exceed Twenty-Five Thousand Dollars ($25,000.00).

## COUNT III
### Costs and Attorney's Fees (As to Individual Defendants)

71. The Connor Group re-alleges and incorporates the preceding paragraphs as if fully restated here.

72. Paragraph 13 of Moreno, Hedrick, Lewis, Vo, and Nelson's Agreements and paragraph 9 of Austin's Agreement entitles The Connor Group to recover from the Individual

Defendants all costs and attorney's fees it incurs as a result of their breach of the Agreements. *See* **Exhibit 1**.

73.    As set forth in more detail in the preceding allegations, the Individual Defendants are in breach of the Agreements for, among other reasons, directly or indirectly soliciting or participating in the solicitation of The Connor Group's associates for purposes of inducing them to leave the employ of The Connor Group or to become employed by another entity.

74.    As a result of the Individual Defendants' breach(es) of the Agreements, The Connor Group has incurred, and will continue to incur, attorney's fees and costs, including those related to this lawsuit, that it is entitled to recover from the Individual Defendants.

**COUNT IV**
**Injunctive Relief (As to Defendants)**

75.    The Connor Group re-alleges and incorporates the preceding paragraphs as if fully restated here.

76.    Unless enjoined, Defendants' wrongful conduct will continue and cause immediate and irreparable harm to The Connor Group.

77.    The Connor Group has a reasonable probability of success on the merits of this action.

78.    The Connor Group has no adequate remedy at law because not all of the harm it has suffered, is suffering, and will continue to suffer can be definitely determined and reduced to damages. Nor will damages related to certain wrongful conduct prevent further wrongful conduct that is ongoing or that may occur in the future.

79.    The granting of injunctive relief is necessary and will not harm third parties. Injunctive relief also furthers the public interest in preventing unfair competition and protecting businesses' confidential information, proprietary information, and trade secrets.

80.     The balance of the equities strongly favors issuance of the requested injunctive relief in The Connor Group's favor against Defendants.

**<u>COUNT V</u>**
**Civil Conspiracy (As to Defendants)**

81.     The Connor Group realleges and incorporates by reference herein the foregoing allegations of the Complaint.

82.     Defendants coordinated and devised a plan to solicit current and former employees of The Connor Group, including the other Individual Defendants, to join Mark Spain's real estate offices, including but not limited to locations in Georgia and Florida where The Connor Group maintains properties.  All involved had a common understanding and design and acted to knowingly promote it. In the short span of approximately six months, the Individual Defendants resigned their employment with The Connor Group to become employed with Mark Spain. The Individual Defendants, with the encouragement and assistance of Mark Spain, continue to solicit other current or former employees to leave their employment with The Connor Group to become employed with Mark Spain in violation of the Agreements.

83.     The actions were taken purposefully, with the intent to deprive The Connor Group of its lawful rights, without a reasonable or lawful excuse, and thus were malicious.

84.     At all relevant times, Defendants' concerted actions were made in pursuit of unlawful acts, including but not limited to tortious interference with contract and breach of contract.

85.     The unlawful acts were committed as alleged in this Complaint.

86.     As a direct and proximate result of Defendants' conspiracy, The Connor Group has been damaged in an amount to be determined at trial.

87.     Defendants' actions were willful and taken with actual malice, entitling The Connor Group to punitive damages and attorney fees.

**WHEREFORE**, The Connor Group demands the following relief:

(1) Preliminary and permanent injunctive relief;

(2) Compensatory damages in an amount to be proven at trial;

(3) Punitive damages;

(4) Plaintiff's reasonable attorneys' fees; and,

(5) Any other or further relief that may be just and equitable.

Respectfully submitted,

COOLIDGE WALL CO., L.P.A.

By: */s/ David P. Pierce*
    David P. Pierce (0061972)
    Benjamin A. Mazer (0087756)
    Samantha R. Shemavonian (0104862)
    33 W. First Street, Suite 200
    Dayton, OH 45402
    Tel: 937-449-5543; Fax: 937-223-6705
    Email: pierce@coollaw.com
           mazer@coollaw.com
           shemavonian@coollaw.com

*ATTORNEYS FOR PLAINTIFF*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's ECF System and copies will be mailed via U.S. Mail to those parties to whom electronic notice has not been sent. Parties may access the filing through the Court's system.

_____ */s/ David P. Pierce*_____

David P. Pierce

008866\00333\4916-0489-8834.3

# EMPLOYMENT AGREEMENT FORM

This Agreement is entered into between The Connor Group, A Real Estate Investment Firm, LLC 10510 Springboro Pike, Miamisburg, Ohio 45342, (hereinafter "EMPLOYER"), and _Jennifer Nelson_, (hereinafter "ASSOCIATE"). EMPLOYER hereby agrees to employ and/or continue the employment of ASSOCIATE, subject to the terms and conditions set forth below.

1.    COMPENSATION. In consideration for such employment and the promises set forth herein, EMPLOYER shall accord to said ASSOCIATE such salary and other benefits as shall from time to time be agreed upon between the parties.

2.    DUTIES. ASSOCIATE shall utilize their best efforts of performing services for the EMPLOYER as a _____ _Manager_ as well as such other duties as they are from time to time directed to perform. ASSOCIATE agrees to devote their full time and energy to performing their duties for EMPLOYER in exchange for the compensation they will receive. ASSOCIATE agrees to abide by all of EMPLOYER's rules, policies, procedures, practices, and directives. ASSOCIATE will do nothing which competes with EMPLOYER or which may cause a conflict of interest with the EMPLOYER. ASSOCIATE agrees that they will not seek, nor undertake any other employment while in the employ of the EMPLOYER.

3.    CONFIDENTIAL INFORMATION. It is understood between the parties that, during the term of ASSOCIATE's employment, ASSOCIATE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets relating to the business of EMPLOYER. Such confidential information, proprietary information, and trade secrets include but are not limited to EMPLOYER's systems, policies, procedures, manuals, forms, seminar materials, financial records, reports, financial plans, contracts, customer lists and information, vendor lists, vendor pricing and information, and marketing/customer retention strategies. ASSOCIATE expressly covenants and agrees that they will not at any time during their employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for their own benefit or the benefit of others.

4.    EMPLOYER PROPERTY. ASSOCIATE further agrees that they will not remove from the EMPLOYER'S premises any files, records, reports, manuals, documents, drawings, specifications, equipment or similar items, including any copies, facsimiles, or reproductions thereof, owned by or relating to the business of EMPLOYER, except where required for the performance of ASSOCIATE'S duties for EMPLOYER. All such materials shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of ASSOCIATE from employment. This paragraph applies to all such materials coming into the possession of ASSOCIATE, including but not limited to materials prepared and produced by ASSOCIATE.

5.    ASSOCIATE COMPETITION. ASSOCIATE further agrees that, during the term of their employment, and for a period of two years after termination of said employment for any reason, they shall not engage, directly or indirectly, individually or as an agent, associate, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which is engaged in the same or similar business as EMPLOYER or any of its affiliated entities, within a 50 mile radius of any property owned or managed by EMPLOYER or any of its affiliated entities.

6.    SOLICITATION OF ASSOCIATES. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of other associates of EMPLOYER for the purpose of inducing them to leave the employ of EMPLOYER or to become employed by another entity.

7.    SOLICITATION OF CUSTOMERS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of any actual or prospective customers or tenants of EMPLOYER for the purposes of inducing them to discontinue doing business with EMPLOYER or for purposes of inducing them to do business with any of EMPLOYER's competitors. For purposes of this paragraph, a prospective customer or tenant shall include any customer or tenant who has had contact with EMPLOYER for the purposes of potentially becoming a customer or tenant.

**Exhibit 1**

8.     SOLICITATION OF INVESTORS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, contact or solicit investors-members or potential investors-members relating to any business or investment opportunities. ASSOCIATE further agrees that during their employment, and after the termination thereof for any reason, they will not disclose information about such investors-members or potential investors-members to any other individual or entity. For purposes of this Paragraph, investors-members and potential investors-members includes any investors-members or potential investors-members that ASSOCIATE became aware of during their employment with EMPLOYER, including but not limited to investors-members or potential investors-members developed through ASSOCIATE'S efforts.

9.     NON-DISPARAGEMENT. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly whether verbally, in writing, by email, over the internet or by any other means whatsoever, make, insinuate or imply any false or negative comments relating to EMPLOYER, or any of its successors, assigns, affiliates, owners, officers and employees, and their respective family members.

10.     REPAYMENT OF OUTSIDE TRAINING COSTS. Should the ASSOCIATE terminate their employment within the first 12 months of their hire date, the ASSOCIATE agrees to reimburse the EMPLOYER for any direct costs incurred for outside training of the ASSOCIATE (outside training defined as seminars or other training programs conducted on the fee-paid basis by organizations other than the EMPLOYER).

11.     EMPLOYER'S RIGHTS. Nothing within this Agreement shall be construed to restrict or modify any rights of EMPLOYER to determine its policies, rules of conduct, and practices, and discipline ASSOCIATE for perceived violations thereof. EMPLOYER shall have absolute discretion in making assignments of work and directing the time and manner of ASSOCIATE's work

12.     SUCCESSORS. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, executors, administrators, successors, and assigns.

13.     ENFORCEMENT. This Agreement shall be enforceable in law or in equity. In the event that this Agreement is breached by ASSOCIATE, EMPLOYER shall be entitled to recover from ASSOCIATE all costs and attorney's fees incurred by EMPLOYER as a result of or arising out of said breach, in addition to all other remedies provided in law or in equity.

14.     GOVERNING LAW. This Agreement shall be construed under the laws of the State of Ohio.

15.     TERMINATION. Notwithstanding anything contained herein, either ASSOCIATE or EMPLOYER may terminate the employment relationship between the parties at any time, and for any reason, with or without notice.

16.     ENTIRE AGREEMENT / MODIFICATION. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements, understandings, promises, and representations made by either party to the other concerning such subject matter. This Agreement may not be modified in any manner except by an instrument in writing signed by both parties. A waiver of any provision of this Agreement in the event of breach thereof shall not constitute a waiver of that or any other provision in the event of any subsequent breach or breaches.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the _____2nd_____ day of _March_

2020

_____       _Jennifer Nelson_____
Witness                              ASSOCIATE

_____       _____
Witness                              EMPLOYER

Rev. May 21, 2018 SED

# EMPLOYMENT AGREEMENT FORM

This Agreement is entered into between <u>The Connor Group</u>, 10510 Springboro Pike, Miamisburg, Ohio 45342, (hereinafter "EMPLOYER"), and <u>Jennifer Moreno</u>, (hereinafter "ASSOCIATE"). EMPLOYER hereby agrees to employ and/or continue the employment of ASSOCIATE, subject to the terms and conditions set forth below.

1.  <u>COMPENSATION.</u> In consideration for such employment and the promises set forth herein, EMPLOYER shall accord to said ASSOCIATE such salary and other benefits as shall from time to time be agreed upon between the parties.

2.  <u>DUTIES.</u> ASSOCIATE shall utilize their best efforts of performing services for the EMPLOYER as a _____ _____ as well as such other duties as they are from time to time directed to perform. ASSOCIATE agrees to devote their full time and energy to performing their duties for EMPLOYER in exchange for the compensation they will receive. ASSOCIATE agrees to abide by all of EMPLOYER's rules, policies, procedures, practices, and directives. ASSOCIATE will do nothing which competes with EMPLOYER or which may cause a conflict of interest with the EMPLOYER. ASSOCIATE agrees that they will not seek, nor undertake any other employment while in the employ of the EMPLOYER.

3.  <u>CONFIDENTIAL INFORMATION.</u> It is understood between the parties that, during the term of ASSOCIATE's employment, ASSOCIATE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets relating to the business of EMPLOYER. Such confidential information, proprietary information, and trade secrets include but are not limited to EMPLOYER's systems, policies, procedures, manuals, forms, seminar materials, financial records, reports, financial plans, contracts, customer lists and information, vendor lists, vendor pricing and information, and marketing/customer retention strategies. ASSOCIATE expressly covenants and agrees that they will not at any time during their employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for their own benefit or the benefit of others.

4.  <u>EMPLOYER PROPERTY.</u> ASSOCIATE further agrees that they will not remove from the EMPLOYER'S premises any files, records, reports, manuals, documents, drawings, specifications, equipment or similar items, including any copies, facsimiles, or reproductions thereof, owned by or relating to the business of EMPLOYER, except where required for the performance of ASSOCIATE'S duties for EMPLOYER. All such materials shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of ASSOCIATE from employment. This paragraph applies to all such materials coming into the possession of ASSOCIATE, including but not limited to materials prepared and produced by ASSOCIATE.

5.  <u>ASSOCIATE COMPETITION.</u> ASSOCIATE further agrees that, during the term of their employment, and for a period of two years after termination of said employment for any reason, they shall not engage, directly or indirectly, individually or as an agent, associate, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which is engaged in the same or similar business as EMPLOYER or any of its affiliated entities, within a 50 mile radius of any property owned or managed by EMPLOYER or any of its affiliated entities.

6.  <u>SOLICITATION OF ASSOCIATES.</u> ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of other associates of EMPLOYER for the purpose of inducing them to leave the employ of EMPLOYER or to become employed by another entity.

7.  <u>SOLICITATION OF CUSTOMERS.</u> ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of any actual or prospective customers or tenants of EMPLOYER for the purposes of inducing them to discontinue doing business with EMPLOYER or for purposes of inducing them to do business with any of EMPLOYER's competitors. For purposes of this paragraph, a prospective customer or tenant shall include any customer or tenant who has had contact with EMPLOYER for the purposes of potentially becoming a customer or tenant.

# EMPLOYMENT AGREEMENT FORM

This Agreement is entered into between The Connor Group, A Real Estate Investment Firm, LLC 10510 Springboro Pike, Miamisburg, Ohio 45342, (hereinafter "EMPLOYER"), and Megan Hedrick, (hereinafter "ASSOCIATE"). EMPLOYER hereby agrees to employ and/or continue the employment of ASSOCIATE, subject to the terms and conditions set forth below.

1. COMPENSATION. In consideration for such employment and the promises set forth herein, EMPLOYER shall accord to said ASSOCIATE such salary and other benefits as shall from time to time be agreed upon between the parties.

2. DUTIES. ASSOCIATE shall utilize their best efforts of performing services for the EMPLOYER as a _____ Property manager as well as such other duties as they are from time to time directed to perform. ASSOCIATE agrees to devote their full time and energy to performing their duties for EMPLOYER in exchange for the compensation they will receive. ASSOCIATE agrees to abide by all of EMPLOYER's rules, policies, procedures, practices, and directives. ASSOCIATE will do nothing which competes with EMPLOYER or which may cause a conflict of interest with the EMPLOYER. ASSOCIATE agrees that they will not seek, nor undertake any other employment while in the employ of the EMPLOYER.

3. CONFIDENTIAL INFORMATION. It is understood between the parties that, during the term of ASSOCIATE's employment, ASSOCIATE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets relating to the business of EMPLOYER. Such confidential information, proprietary information, and trade secrets include but are not limited to EMPLOYER's systems, policies, procedures, manuals, forms, seminar materials, financial records, reports, financial plans, contracts, customer lists and information, vendor lists, vendor pricing and information, and marketing/customer retention strategies. ASSOCIATE expressly covenants and agrees that they will not at any time during their employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for their own benefit or the benefit of others.

4. EMPLOYER PROPERTY. ASSOCIATE further agrees that they will not remove from the EMPLOYER'S premises any files, records, reports, manuals, documents, drawings, specifications, equipment or similar items, including any copies, facsimiles, or reproductions thereof, owned by or relating to the business of EMPLOYER, except where required for the performance of ASSOCIATE'S duties for EMPLOYER. All such materials shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of ASSOCIATE from employment. This paragraph applies to all such materials coming into the possession of ASSOCIATE, including but not limited to materials prepared and produced by ASSOCIATE.

5. ASSOCIATE COMPETITION. ASSOCIATE further agrees that, during the term of their employment, and for a period of two years after termination of said employment for any reason, they shall not engage, directly or indirectly, individually or as an agent, associate, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which is engaged in the same or similar business as EMPLOYER or any of its affiliated entities, within a 50 mile radius of any property owned or managed by EMPLOYER or any of its affiliated entities.

6. SOLICITATION OF ASSOCIATES. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of other associates of EMPLOYER for the purpose of inducing them to leave the employ of EMPLOYER or to become employed by another entity.

7. SOLICITATION OF CUSTOMERS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of any actual or prospective customers or tenants of EMPLOYER for the purposes of inducing them to discontinue doing business with EMPLOYER or for purposes of inducing them to do business with any of EMPLOYER's competitors. For purposes of this paragraph, a prospective customer or tenant shall include any customer or tenant who has had contact with EMPLOYER for the purposes of potentially becoming a customer or tenant.

8.     SOLICITATION OF INVESTORS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, contact or solicit investors-members or potential investors-members relating to any business or investment opportunities. ASSOCIATE further agrees that during their employment, and after the termination thereof for any reason, they will not disclose information about such investors-members or potential investors-members to any other individual or entity. For purposes of this Paragraph, investors-members and potential investors-members includes any investors-members or potential investors-members that ASSOCIATE became aware of during their employment with EMPLOYER, including but not limited to investors-members or potential investors-members developed through ASSOCIATE'S efforts.

9.     NON-DISPARAGEMENT. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly whether verbally, in writing, by email, over the internet or by any other means whatsoever, make, insinuate or imply any false or negative comments relating to EMPLOYER, or any of its successors, assigns, affiliates, owners, officers and employees, and their respective family members.

10.     REPAYMENT OF OUTSIDE TRAINING COSTS. Should the ASSOCIATE terminate their employment within the first 12 months of their hire date, the ASSOCIATE agrees to reimburse the EMPLOYER for any direct costs incurred for outside training of the ASSOCIATE (outside training defined as seminars or other training programs conducted on the fee-paid basis by organizations other than the EMPLOYER).

11.     EMPLOYER'S RIGHTS. Nothing within this Agreement shall be construed to restrict or modify any rights of EMPLOYER to determine its policies, rules of conduct, and practices, and discipline ASSOCIATE for perceived violations thereof. EMPLOYER shall have absolute discretion in making assignments of work and directing the time and manner of ASSOCIATE's work

12.     SUCCESSORS. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, executors, administrators, successors, and assigns.

13.     ENFORCEMENT. This Agreement shall be enforceable in law or in equity. In the event that this Agreement is breached by ASSOCIATE, EMPLOYER shall be entitled to recover from ASSOCIATE all costs and attorney's fees incurred by EMPLOYER as a result of or arising out of said breach, in addition to all other remedies provided in law or in equity.

14.     GOVERNING LAW. This Agreement shall be construed under the laws of the State of Ohio.

15.     TERMINATION. Notwithstanding anything contained herein, either ASSOCIATE or EMPLOYER may terminate the employment relationship between the parties at any time, and for any reason, with or without notice.

16.     ENTIRE AGREEMENT / MODIFICATION. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements, understandings, promises, and representations made by either party to the other concerning such subject matter. This Agreement may not be modified in any manner except by an instrument in writing signed by both parties. A waiver of any provision of this Agreement in the event of breach thereof shall not constitute a waiver of that or any other provision in the event of any subsequent breach or breaches.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the _____first_____ day of _December_ 2020

| megan Hedrick | Megan Hedrill |
|---|---|
| Witness | ASSOCIATE |
| Witness | EMPLOYER |

Rev. May 21, 2018 SED

# EMPLOYMENT AGREEMENT FORM

This Agreement is entered into between The Connor Group, A Real Estate Investment Firm, LLC 10510 Springboro Pike, Miamisburg, Ohio 45342, (hereinafter "EMPLOYER"), and ___Hn VO_____, (hereinafter "ASSOCIATE"). EMPLOYER hereby agrees to employ and/or continue the employment of ASSOCIATE, subject to the terms and conditions set forth below.

1.    COMPENSATION.  In consideration for such employment and the promises set forth herein, EMPLOYER shall accord to said ASSOCIATE such salary and other benefits as shall from time to time be agreed upon between the parties.

2.    DUTIES.  ASSOCIATE shall utilize their best efforts of performing services for the EMPLOYER as a _____ Manager _____ as well as such other duties as they are from time to time directed to perform. ASSOCIATE agrees to devote their full time and energy to performing their duties for EMPLOYER in exchange for the compensation they will receive. ASSOCIATE agrees to abide by all of EMPLOYER's rules, policies, procedures, practices, and directives. ASSOCIATE will do nothing which competes with EMPLOYER or which may cause a conflict of interest with the EMPLOYER. ASSOCIATE agrees that they will not seek, nor undertake any other employment while in the employ of the EMPLOYER.

3.    CONFIDENTIAL INFORMATION.  It is understood between the parties that, during the term of ASSOCIATE's employment, ASSOCIATE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets relating to the business of EMPLOYER. Such confidential information, proprietary information, and trade secrets include but are not limited to EMPLOYER's systems, policies, procedures, manuals, forms, seminar materials, financial records, reports, financial plans, contracts, customer lists and information, vendor lists, vendor pricing and information, and marketing/customer retention strategies. ASSOCIATE expressly covenants and agrees that they will not at any time during their employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for their own benefit or the benefit of others.

4.    EMPLOYER PROPERTY.  ASSOCIATE further agrees that they will not remove from the EMPLOYER'S premises any files, records, reports, manuals, documents, drawings, specifications, equipment or similar items, including any copies, facsimiles, or reproductions thereof, owned by or relating to the business of EMPLOYER, except where required for the performance of ASSOCIATE'S duties for EMPLOYER. All such materials shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of ASSOCIATE from employment. This paragraph applies to all such materials coming into the possession of ASSOCIATE, including but not limited to materials prepared and produced by ASSOCIATE.

5.    ASSOCIATE COMPETITION.  ASSOCIATE further agrees that, during the term of their employment, and for a period of two years after termination of said employment for any reason, they shall not engage, directly or indirectly, individually or as an agent, associate, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which is engaged in the same or similar business as EMPLOYER or any of its affiliated entities, within a 50 mile radius of any property owned or managed by EMPLOYER or any of its affiliated entities.

6.    SOLICITATION OF ASSOCIATES.  ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of other associates of EMPLOYER for the purpose of inducing them to leave the employ of EMPLOYER or to become employed by another entity.

7.    SOLICITATION OF CUSTOMERS.  ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of any actual or prospective customers or tenants of EMPLOYER for the purposes of inducing them to discontinue doing business with EMPLOYER or for purposes of inducing them to do business with any of EMPLOYER's competitors. For purposes of this paragraph, a prospective customer or tenant shall include any customer or tenant who has had contact with EMPLOYER for the purposes of potentially becoming a customer or tenant.

8.     SOLICITATION OF INVESTORS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, contact or solicit investors-members or potential investors-members relating to any business or investment opportunities. ASSOCIATE further agrees that during their employment, and after the termination thereof for any reason, they will not disclose information about such investors-members or potential investors-members to any other individual or entity. For purposes of this Paragraph, investors-members and potential investors-members includes any investors-members or potential investors-members that ASSOCIATE became aware of during their employment with EMPLOYER, including but not limited to investors-members or potential investors-members developed through ASSOCIATE'S efforts.

9.     NON-DISPARAGEMENT. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly whether verbally, in writing, by email, over the internet or by any other means whatsoever, make, insinuate or imply any false or negative comments relating to EMPLOYER, or any of its successors, assigns, affiliates, owners, officers and employees, and their respective family members.

10.     REPAYMENT OF OUTSIDE TRAINING COSTS. Should the ASSOCIATE terminate their employment within the first 12 months of their hire date, the ASSOCIATE agrees to reimburse the EMPLOYER for any direct costs incurred for outside training of the ASSOCIATE (outside training defined as seminars or other training programs conducted on the fee-paid basis by organizations other than the EMPLOYER).

11.     EMPLOYER'S RIGHTS. Nothing within this Agreement shall be construed to restrict or modify any rights of EMPLOYER to determine its policies, rules of conduct, and practices, and discipline ASSOCIATE for perceived violations thereof. EMPLOYER shall have absolute discretion in making assignments of work and directing the time and manner of ASSOCIATE's work

12.     SUCCESSORS. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, executors, administrators, successors, and assigns.

13.     ENFORCEMENT. This Agreement shall be enforceable in law or in equity. In the event that this Agreement is breached by ASSOCIATE, EMPLOYER shall be entitled to recover from ASSOCIATE all costs and attorney's fees incurred by EMPLOYER as a result of or arising out of said breach, in addition to all other remedies provided in law or in equity.

14.     GOVERNING LAW. This Agreement shall be construed under the laws of the State of Ohio.

15.     TERMINATION. Notwithstanding anything contained herein, either ASSOCIATE or EMPLOYER may terminate the employment relationship between the parties at any time, and for any reason, with or without notice.

16.     ENTIRE AGREEMENT / MODIFICATION. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements, understandings, promises, and representations made by either party to the other concerning such subject matter. This Agreement may not be modified in any manner except by an instrument in writing signed by both parties. A waiver of any provision of this Agreement in the event of breach thereof shall not constitute a waiver of that or any other provision in the event of any subsequent breach or breaches.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the ___November___ day of ___2___, 2030

_____       _____
Witness                                ASSOCIATE

_____       _____
Witness                                EMPLOYER

Rev. May 21, 2018 SED

## EMPLOYMENT AGREEMENT

This Agreement is entered into between THE CONNOR GROUP, A REAL ESTATE INVESTMENT FIRM, LLC (hereinafter "EMPLOYER") and ‾T‾i‾n‾a‾ ‾A‾u‾s‾t‾i‾n‾ (hereinafter "EMPLOYEE"). EMPLOYER hereby agrees to employ EMPLOYEE, and EMPLOYEE agrees to such employment, subject to the terms and conditions as set forth below.

1. Compensation and Benefits. EMPLOYEE shall initially receive such compensation and benefits as offered by EMPLOYER at the time of this Agreement, and thereafter as shall be from time to time determined by EMPLOYER.

2. EMPLOYEE's Duties. EMPLOYEE shall perform such duties as shall be from time to time determined by EMPLOYER. EMPLOYEE shall diligently and conscientiously devote his/her full business time, attention and best efforts in discharging his/her duties to the best of his/her ability. EMPLOYEE shall demonstrate belief in and execution of EMPLOYER's core systems, operating beliefs and strategies, and business philosophies. EMPLOYEE shall exercise the foremost dedication and loyalty in the performance of such duties, and shall perform all duties reasonably related to his/her position, as well as such other duties as shall be from time to time directed by EMPLOYER. EMPLOYEE shall not engage in outside employment without prior written consent of EMPLOYER. EMPLOYEE shall abide by all policies, practices, rules, and directives of EMPLOYER in the performance of his/her duties.

3. Confidential Information. It is understood between the parties that, during the term of his/her employment, EMPLOYEE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets, relating to the business of EMPLOYER. Such confidential information, proprietary information, and trade secrets include but are not limited to personnel information, tenant and vendor lists and information, training methods, techniques and strategies, marketing and advertising methods, and any and all information concerning EMPLOYER's systems, procedures, manuals, financial records, plans and materials, price lists and information, and pricing methods and strategies. EMPLOYEE expressly covenants and agrees that he/she will not at any time during his/her employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for his/her own benefit or for the benefit of others.

4. Employee Competition. EMPLOYEE further agrees that, during his/her employment, and for a period of two years after termination of said employment for any reason, he/she shall not engage, directly or indirectly, individually or as an agent, employee, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which competes with EMPLOYER in the acquisition, ownership, operation, management, or sale of residential rental properties, or in any other business of the type conducted, authorized, offered or provided by EMPLOYER or its affiliates. After termination of employment, these restrictions shall apply only (a) within a 25 mile radius of any property where any operations conducted by EMPLOYER or its affiliates were performed, supervised, or assisted in by EMPLOYEE, and (b) within any county where any operations conducted by EMPLOYER or its affiliates were performed, supervised, or assisted in by EMPLOYEE.

5. Recruiting of Employees. EMPLOYEE acknowledges that EMPLOYER has a substantial investment in its employees, and that such employees are critical to EMPLOYER's business. Furthermore, EMPLOYEE acknowledges that, during the term of his/her employment, he/she will have access to and become acquainted with confidential information concerning the unique skills, abilities, and qualifications of EMPLOYER's employees. Therefore, EMPLOYEE further agrees that, during his/her employment, and for a period of three years after the termination thereof for any reason, he/she shall not, directly or indirectly, hire or recruit, or participate in the hiring or recruiting of, other employees of

Page 1 of 3

EMPLOYER, for the purposes of inducing them to leave the employ of EMPLOYER or to become employed by another entity. EMPLOYER further agrees that during his/her employment, and for a period of three years after the termination thereof for any reason, he/she will not disclose information about such employees or recommend such employees to prospective employers. EMPLOYEE further agrees that he/she will not directly or indirectly induce such employees to breach any legal obligations they have to EMPLOYER. EMPLOYEE acknowledges that the provisions contained within this paragraph are of the essence to this Agreement. EMPLOYEE agrees that the damage which EMPLOYER would suffer as a result of breach of these provisions by EMPLOYEE would be irreparable, and incapable of exact ascertainment. Therefore, EMPLOYEE agrees that EMPLOYER shall be entitled to injunctive relief in the event of such breach. Furthermore, all bonuses which otherwise might be payable to EMPLOYEE shall not be paid and shall be forfeited in their entirety. Furthermore, it is expressly understood that one-fifth of EMPLOYEE's salary is being paid as consideration for the provisions of this paragraph. In the event that any court finds any such provisions are unenforceable, in whole or in part, or modifies any such provisions, EMPLOYEE agrees to repay to EMPLOYER all consideration paid for the provisions of this paragraph.

6.  **EMPLOYER Property.** EMPLOYEE further agrees that he/she will not remove from EMPLOYER's premises any files, records, reports, manuals, documents, drawings, specifications, equipment or similar items, including but not limited to any copies, facsimiles, reproductions or electronically stored information, owned by or relating to the business of EMPLOYER, except where required for the performance of EMPLOYEE's duties for EMPLOYER. All such items shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of EMPLOYEE from employment. This paragraph applies to all such items coming into the possession of EMPLOYEE, including but not limited to materials prepared and produced by EMPLOYEE.

7.  **Termination.** Notwithstanding anything contained herein, either EMPLOYEE or EMPLOYER may terminate this Agreement, and EMPLOYEE's employment hereunder, at any time, and for any reason, with or without notice.

8.  **Effect of Termination.** Except as otherwise provided herein, termination of this Agreement terminates all obligations of the parties hereunder. Provided, however, it is expressly understood that the rights and obligations of the parties under paragraph nos. 3 through 6 shall survive termination of this Agreement and of EMPLOYEE's employment hereunder.

9.  **Enforcement/Interpretation.** This Agreement shall be enforceable in law or in equity. In the event that this Agreement is breached by EMPLOYEE, EMPLOYER shall be entitled to recover from EMPLOYEE all costs and attorney's fees incurred by EMPLOYER as a result of or arising out of such breach, in addition to all other remedies provided in law or in equity. This Agreement shall be enforceable by and inure to the benefit of EMPLOYER's affiliates and their successors and assigns. This Agreement shall be construed without regard to the identity of the drafter. This Agreement shall be construed and enforced in accordance with the laws of the State of Georgia, except for any conflicts of law provisions which would require reference to the law of another state. Paragraph nos. 3 through 6 of this Agreement shall be construed, in a manner consistent with their terms, to provide the maximum protection available to EMPLOYER and its affiliates under Georgia law as of the date of this Agreement. The duration of the restraints set forth in paragraph nos. 4 and 5 shall automatically extend for an amount of time equal to the amount of time that violation of such provision has continued. In any action by any party relating to this Agreement or EMPLOYEE's employment, venue shall be proper only in a state or federal court located in Montgomery County, Ohio, except that, for purposes of enforcing paragraph nos. 3 through 6 of this Agreement, venue shall be proper in any county where the EMPLOYER does business, or in any county where EMPLOYEE resides or has conducted the activity giving rise to the claim. If any portion of this Agreement is found to be invalid, illegal, or unenforceable, such shall not affect the validity, legality, or enforceability of the remainder of the Agreement. A court may modify the restrictions in paragraph nos. 3 through 6 of this Agreement to the

maximum extent provided for under Georgia law in order to make such restrictions reasonable.

10.  Entire Agreement/Modification. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements, understandings, promises, and representations made by either party to the other concerning such subject matter. This Agreement specifically modifies and supercedes any prior employment agreements entered into between the parties. This Agreement may not be modified in any manner except by an instrument in writing signed by both parties. A waiver of any provision of this Agreement in the event of breach thereof shall not constitute a waiver of that or any other provision in the event of any subsequent breach or breaches.

11.  Term. This Agreement shall be effective commencing on EMPLOYEE's first date of employment, and remain in effect until terminated by either party.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on this 14th day of January, 2011.

WITNESS:                                  EMPLOYEE:

_____                   _____
                                          (Signature)

                                          _____
                                          (Print Name)

WITNESS:                                  EMPLOYER:

_____                   By: _____
                                          (Signature)

                                          _____     _____
                                          (Print Name)                 (Title)

                                          THE CONNOR GROUP, LLC

Page 3 of 3

# EMPLOYMENT AGREEMENT FORM

This Agreement is entered into between The Connor Group, 10510 Springboro Pike, Miamisburg, Ohio 45342, (hereinafter "EMPLOYER"), and **Ansley Lewis** , (hereinafter "ASSOCIATE"). EMPLOYER hereby agrees to employ and/or continue the employment of ASSOCIATE, subject to the terms and conditions set forth below.



1.  **COMPENSATION.** In consideration for such employment and the promises set forth herein, EMPLOYER shall accord to said ASSOCIATE such salary and other benefits as shall from time to time be agreed upon between the parties.

2.  **DUTIES.** ASSOCIATE shall utilize their best efforts of performing services for the EMPLOYER as a **Property Manager - PCM** as well as such other duties as they are from time to time directed to perform. ASSOCIATE agrees to devote their full time and energy to performing their duties for EMPLOYER in exchange for the compensation they will receive. ASSOCIATE agrees to abide by all of EMPLOYER's rules, policies, procedures, practices, and directives. ASSOCIATE will do nothing which competes with EMPLOYER or which may cause a conflict of interest with the EMPLOYER. ASSOCIATE agrees that they will not seek, nor undertake any other employment while in the employ of the EMPLOYER.

3.  **CONFIDENTIAL INFORMATION.** It is understood between the parties that, during the term of ASSOCIATE's employment, ASSOCIATE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets relating to the business of EMPLOYER. Such confidential information, proprietary information, and trade secrets include but are not limited to EMPLOYER's systems, policies, procedures, manuals, forms, seminar materials, financial records, reports, financial plans, contracts, customer lists and information, vendor lists, vendor pricing and information, and marketing/customer retention strategies. ASSOCIATE expressly covenants and agrees that they will not at any time during their employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for their own benefit or the benefit of others.

4.  **EMPLOYER PROPERTY.** ASSOCIATE further agrees that they will not remove from the EMPLOYER'S premises any files, records, reports, manuals, documents, drawings, specifications, equipment or similar items, including any copies, facsimiles, or reproductions thereof, owned by or relating to the business of EMPLOYER, except where required for the performance of ASSOCIATE's duties for EMPLOYER. All such materials shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of ASSOCIATE from employment. This paragraph applies to all such materials coming into the possession of ASSOCIATE, including but not limited to materials prepared and produced by ASSOCIATE.

5.  **ASSOCIATE COMPETITION.** ASSOCIATE further agrees that, during the term of their employment, and for a period of two years after termination of said employment for any reason, they shall not engage, directly or indirectly, individually or as an agent, associate, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which is engaged in the same or similar business as EMPLOYER or any of its affiliated entities, within a 50 mile radius of any property owned or managed by EMPLOYER or any of its affiliated entities.

6.  **SOLICITATION OF ASSOCIATES.** ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of other associates of EMPLOYER for the purpose of inducing them to leave the employ of EMPLOYER or to become employed by another entity.

7.  **SOLICITATION OF CUSTOMERS.** ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of any actual or prospective customers or tenants of EMPLOYER for the purposes of inducing them to discontinue doing business with EMPLOYER or for purposes of inducing them to do business with any of EMPLOYER's competitors. For purposes of this paragraph, a prospective customer or tenant shall include any customer or tenant who has had contact with EMPLOYER for the purposes of potentially becoming a customer or tenant.

May. 19. 2015 12:32PM    WESTFIELD WATER RESOURCES 27 SAC                  No. 8526    P. 10/23

8.    **REPAYMENT OF OUTSIDE TRAINING COSTS.**  Should the ASSOCIATE terminate their employment within the first 12 months of their hire date, the ASSOCIATE agrees to reimburse the EMPLOYER for any direct costs incurred for outside training of the ASSOCIATE (outside training defined as seminars or other training programs conducted on the fee-paid basis by organizations other than the EMPLOYER).

9.    **EMPLOYER'S RIGHTS.**  Nothing within this Agreement shall be construed to restrict or modify any rights of EMPLOYER to determine its policies, rules of conduct, and practices, and discipline ASSOCIATE for perceived violations thereof. EMPLOYER shall have absolute discretion in making assignments of work and directing the time and manner of ASSOCIATE's work

10.    **SUCCESSORS.**  This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, executors, administrators, successors, and assigns.

11.    **ENFORCEMENT.**  This Agreement shall be enforceable in law or in equity.  In the event that this Agreement is breached by ASSOCIATE, EMPLOYER shall be entitled to recover from ASSOCIATE all costs and attorney's fees incurred by EMPLOYER as a result of or arising out of said breach, in addition to all other remedies provided in law or in equity.

12.    **GOVERNING LAW.**  This Agreement shall be construed under the laws of the State of Ohio.

13.    **TERMINATION.**  Notwithstanding anything contained herein, either ASSOCIATE or EMPLOYER may terminate the employment relationship between the parties at any time, and for any reason, with or without notice.

14.    **ENTIRE AGREEMENT / MODIFICATION.**  This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements, understandings, promises, and representations made by either party to the other concerning such subject matter.  This Agreement may not be modified in any manner except by an instrument in writing signed by both parties.  A waiver of any provision of this Agreement in the event of breach thereof shall not constitute a waiver of that or any other provision in the event of any subsequent breach or breaches.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the _____ 18ᵗʰ _____ day of May , 2015 .

_____             _____
Witness                                                  ASSOCIATE

_____             _____
Witness                                                  EMPLOYER

Wendy Green, Payroll Administrator
The Connor Group
10510 Springboro Pike
Miamisburg, OH 45342
937-350-3318 phone  937-439-4608 fax
wgreen@connorgroup.com

K:\Files\ACCT\PAYROLL\New Hire Packet\2009 new hire info\EMPLOYMENT AGREEMENT FORM.doc



## COOLIDGE WALL
_A Legal Professional Association_

Merle F. Wilberding
J. Stephen Herbert
R. Scott Blackburn
Sam Warwar
Terence L. Fague
Richard A. Talda
David C. Korte
Stephen M. McHugh
Douglas M. Ventura
Kristin A. Finch
David P. Pierce
Shannon L. Costello
Christopher R. Conard
Marc L. Fleischauer
Michelle D. Bach
Gregory M. Ewers
Daniel J. Gentry
R. Michael Osborn
Patricia J. Friesinger
Joshua R. Lounsbury
Michael G. Leesman
W. Chip Herin III
Patrick Martin
Jeffrey A. Winwood
Lu Ann Stanley
Tino M. Monaldo
Edie E. Crump
Dina M. Cary
Erica L. Glass
Benjamin A. Mazer
Robert D. Ballinger
Zachary B. White
Ashley E. Warwar
Elliott V. Haller
Kara T. Ruffolo
Sarah J. Sparks
Jordan P. Staley
Michael J. Ruffolo

J. Bradford Coolidge
1886-1965

Hugh E. Wall, Jr.
1912-2001

Ronald S. Pretekin
1942-2011

Suite 200
33 West First Street
Dayton, Ohio 45402-1289
937-223-8177
Fax: 937-223-6705
www.coollaw.com

Direct Dial Number
937 449 5543

E-mail Address:
Pierce@coollaw.com

May 31, 2024

VIA EMAIL AND REGULAR U.S. MAIL – havo411@yahoo.com

Marc Vo
1238 Hermitage Avenue
Clearwater, FL 33764

Re:    Your Employment Obligations with The Connor Group, A Real Estate
Investment Firm, LLC

Dear Mr. Vo:

I represent The Connor Group, a Real Estate Investment Firm, LLC ("TCG"), with respect to employment matters. I understand that your employment with TCG recently ended.

The purpose of this letter is to remind you of your continuing obligations to TCG. As a part of and in consideration for your prior employment with TCG, you entered into the attached Employment Agreement. In paragraph no. 5 of that Employment Agreement, you agreed that, during employment with TCG and for a period of two years after your separation from employment, you would not compete with TCG anywhere within a 50-mile radius of any property owned or managed by TCG or any of its affiliated entities. In paragraph no. 6 of that Employment Agreement, you agreed that during your employment and after your separation, you would "not, directly or indirectly, solicit or participate in the solicitation" of TCG's associates "for the purpose of inducing them to leave the employ of TCG or to become employed by another entity." Additionally, in paragraph 3 of that Employment Agreement, you further agreed that you would not reveal, disclose or use confidential information of TCG.

It has come to our attention that you have recently gone to work for a competitor of TCG, Mark Spain Real Estate. Additionally, we are aware of several of TCG's former and current associates that you may have solicited to join you at that company. Please be advised that TCG considers its relationships with its employees and customers important business assets. Accordingly, you are directed to refrain from soliciting any of TCG's associates for employment or otherwise breaching your contractual restrictions.

**Exhibit 2**



COOLIDGE WALL
———— *A Legal Professional Association*

Marc Vo
May 31, 2024
Page 2

If you fail to do so, TCG may take immediate legal action without further notice to you. TCG would pursue all available claims and remedies in any such litigation, including but not limited to, recovering its attorney's fees pursuant to paragraph no. 13 of the Employment Agreement. You may also be required to repay the consideration you received for that agreement.

If suit becomes necessary, TCG will seek immediate injunctive relief to restrain and enjoin your conduct, as more fully described above. Additionally, TCG will seek all monetary relief deemed appropriate, including compensatory damages. If you choose to defend against that lawsuit, you may need to do so at your own expense. If TCG procures a money judgment against you, all available avenues will be taken to collect that judgment. You are hereby placed on formal notice that any attempt by you to transfer property out of your name at this time will be considered by us to be a fraudulent conveyance, subjecting all those involved to additional liability.

In anticipation of a lawsuit being filed against you, I further demand that you take immediate steps to preserve and avoid spoliation of information that may be relevant to that litigation. I am advising you that as part of the substantial discovery which will take place if a lawsuit becomes necessary, TCG will be requesting any and all documents and information relating to the conduct in question. Documents existing in paper form, including phone messages and logs, calendars, internal memorandum, and other related documents, including all document drafts, will be requested. The discovery requests also will include all electronically created and/or stored information, including but not limited to, emails, voicemails, text messages, instant messages, word processing files, spreadsheets, PDFs, JPEGs, PowerPoint presentations, database files, cookies, and .ZIP files. You are specifically cautioned that you are not to destroy any such documents and electronically stored information, including computers, cell phones, computer hard drives, and computer disks. Furthermore, you are cautioned to take specific steps to preserve that information. You are cautioned to take out of service, secure and retain from using any computers upon which such information may be resident. You are to notify any actual or prospective employers, internet service providers, telephone companies, and any other entity in custody of such information until further notice. All such information must be preserved notwithstanding any policy or practice which you or any other entity may have to the contrary. You are specifically placed on notice that, if there is a failure to preserve such information as requested, TCG will seek additional damages against you and all others involved for spoliation of evidence. Furthermore, an inference may by drawn by the court that the documents and data which you did not preserve contained evidence which was adverse to you.



Marc Vo
May 31, 2024
Page 3

It is our hope that such legal action will not be necessary and that you understand the seriousness of this situation.

This letter is being sent without waiver of any rights or remedies that TCG may have.

Very truly yours,

David P. Pierce

DPP/kaf
Enclosure

008866\00100\4880-0038-2914.1

# EMPLOYMENT AGREEMENT FORM

This Agreement is entered into between The Connor Group, A Real Estate Investment Firm, LLC 10510 Springboro Pike, Miamisburg, Ohio 45342, (hereinafter "EMPLOYER"), and ___Tia Vo_____, (hereinafter "ASSOCIATE"). EMPLOYER hereby agrees to employ and/or continue the employment of ASSOCIATE, subject to the terms and conditions set forth below.

1.    COMPENSATION. In consideration for such employment and the promises set forth herein, EMPLOYER shall accord to said ASSOCIATE such salary and other benefits as shall from time to time be agreed upon between the parties.

2.    DUTIES. ASSOCIATE shall utilize their best efforts of performing services for the EMPLOYER as a _____ Manager _____ as well as such other duties as they are from time to time directed to perform. ASSOCIATE agrees to devote their full time and energy to performing their duties for EMPLOYER in exchange for the compensation they will receive. ASSOCIATE agrees to abide by all of EMPLOYER's rules, policies, procedures, practices, and directives. ASSOCIATE will do nothing which competes with EMPLOYER or which may cause a conflict of interest with the EMPLOYER. ASSOCIATE agrees that they will not seek, nor undertake any other employment while in the employ of the EMPLOYER.

3.    CONFIDENTIAL INFORMATION. It is understood between the parties that, during the term of ASSOCIATE's employment, ASSOCIATE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets relating to the business of EMPLOYER. Such confidential information, proprietary information, and trade secrets include but are not limited to EMPLOYER's systems, policies, procedures, manuals, forms, seminar materials, financial records, reports, financial plans, contracts, customer lists and information, vendor lists, vendor pricing and information, and marketing/customer retention strategies. ASSOCIATE expressly covenants and agrees that they will not at any time during their employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for their own benefit or the benefit of others.

4.    EMPLOYER PROPERTY. ASSOCIATE further agrees that they will not remove from the EMPLOYER'S premises any files, records, reports, manuals, documents, drawings, specifications, equipment or similar items, including any copies, facsimiles, or reproductions thereof, owned by or relating to the business of EMPLOYER, except where required for the performance of ASSOCIATE'S duties for EMPLOYER. All such materials shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of ASSOCIATE from employment. This paragraph applies to all such materials coming into the possession of ASSOCIATE, including but not limited to materials prepared and produced by ASSOCIATE.

5.    ASSOCIATE COMPETITION. ASSOCIATE further agrees that, during the term of their employment, and for a period of two years after termination of said employment for any reason, they shall not engage, directly or indirectly, individually or as an agent, associate, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which is engaged in the same or similar business as EMPLOYER or any of its affiliated entities, within a 50 mile radius of any property owned or managed by EMPLOYER or any of its affiliated entities.

6.    SOLICITATION OF ASSOCIATES. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of other associates of EMPLOYER for the purpose of inducing them to leave the employ of EMPLOYER or to become employed by another entity.

7.    SOLICITATION OF CUSTOMERS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of any actual or prospective customers or tenants of EMPLOYER for the purposes of inducing them to discontinue doing business with EMPLOYER or for purposes of inducing them to do business with any of EMPLOYER's competitors. For purposes of this paragraph, a prospective customer or tenant shall include any customer or tenant who has had contact with EMPLOYER for the purposes of potentially becoming a customer or tenant.

8.   SOLICITATION OF INVESTORS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, contact or solicit investors-members or potential investors-members relating to any business or investment opportunities. ASSOCIATE further agrees that during their employment, and after the termination thereof for any reason, they will not disclose information about such investors-members or potential investors-members to any other individual or entity. For purposes of this Paragraph, investors-members and potential investors-members includes any investors-members or potential investors-members that ASSOCIATE became aware of during their employment with EMPLOYER, including but not limited to investors-members or potential investors-members developed through ASSOCIATES efforts.

9.   NON-DISPARAGEMENT. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly whether verbally, in writing, by email, over the internet or by any other means whatsoever, make, insinuate or imply any false or negative comments relating to EMPLOYER, or any of its successors, assigns, affiliates, owners, officers and employees, and their respective family members.

10.  REPAYMENT OF OUTSIDE TRAINING COSTS. Should the ASSOCIATE terminate their employment within the first 12 months of their hire date, the ASSOCIATE agrees to reimburse the EMPLOYER for any direct costs incurred for outside training of the ASSOCIATE (outside training defined as seminars or other training programs conducted on the fee-paid basis by organizations other than the EMPLOYER).

11.  EMPLOYER'S RIGHTS. Nothing within this Agreement shall be construed to restrict or modify any rights of EMPLOYER to determine its policies, rules of conduct, and practices, and discipline ASSOCIATE for perceived violations thereof. EMPLOYER shall have absolute discretion in making assignments of work and directing the time and manner of ASSOCIATE's work

12.  SUCCESSORS. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, executors, administrators, successors, and assigns.

13.  ENFORCEMENT. This Agreement shall be enforceable in law or in equity. In the event that this Agreement is breached by ASSOCIATE, EMPLOYER shall be entitled to recover from ASSOCIATE all costs and attorney's fees incurred by EMPLOYER as a result of or arising out of said breach, in addition to all other remedies provided in law or in equity.

14.  GOVERNING LAW. This Agreement shall be construed under the laws of the State of Ohio.

15.  TERMINATION. Notwithstanding anything contained herein, either ASSOCIATE or EMPLOYER may terminate the employment relationship between the parties at any time, and for any reason, with or without notice.

16.  ENTIRE AGREEMENT / MODIFICATION. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements, understandings, promises, and representations made by either party to the other concerning such subject matter. This Agreement may not be modified in any manner except by an instrument in writing signed by both parties. A waiver of any provision of this Agreement in the event of breach thereof shall not constitute a waiver of that or any other provision in the event of any subsequent breach or breaches.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the _November_ day of _2_.

_2020_

_____          _____
Witness                               ASSOCIATE

_____          _____
Witness                               EMPLOYER

Rev. May 21, 2018 SRD



# COOLIDGE WALL
*A Legal Professional Association*

Merle F. Wilberding
J. Stephen Herbert
R. Scott Blackburn
Sam Warwar
Terence L. Fague
Richard A. Talda
David C. Korte
Stephen M. McHugh
Douglas M. Ventura
Kristin A. Finch
David P. Pierce
Shannon L. Costello
Christopher R. Conard
Marc L. Fleischauer
Michelle D. Bach
Gregory M. Ewers
Daniel J. Gentry
R. Michael Osborn
Patricia J. Friesinger
Joshua R. Lounsbury
Michael G. Leesman
W. Chip Herin III
Patrick Martin
Jeffrey A. Winwood
Lu Ann Stanley
Tino M. Monaldo
Edie E. Crump
Dina M. Cary
Erica L. Glass
Benjamin A. Mazer
Robert D. Ballinger
Zachary B. White
Ashley E. Warwar
Elliott V. Haller
Kara T. Ruffolo
Sarah J. Sparks
Jordan P. Staley
Michael J. Ruffolo

J. Bradford Coolidge
1886-1965

Hugh E. Wall, Jr.
1912-2001

Ronald S. Pretekin
1942-2011

Suite 200
33 West First Street
Dayton, Ohio 45402-1289
937-223-8177
Fax: 937-223-6705
www.coollaw.com

Direct Dial Number
937 449 5543

E-mail Address:
Pierce@coollaw.com

May 31, 2024

VIA EMAIL AND REGULAR U.S. MAIL – jnelson0550@gmail.com

Jennifer Nelson
11208 Marvelwood Road
Weeki Wachee, FL 34614

Re:     Your Employment Obligations with The Connor Group, A Real Estate
         Investment Firm, LLC

Dear Ms. Nelson:

I represent The Connor Group, a Real Estate Investment Firm, LLC ("TCG"), with respect to employment matters. I understand that your employment with TCG recently ended.

The purpose of this letter is to remind you of your continuing obligations to TCG. As a part of and in consideration for your prior employment with TCG, you entered into the attached Employment Agreement. In paragraph no. 5 of that Employment Agreement, you agreed that, during employment with TCG and for a period of two years after your separation from employment, you would not compete with TCG anywhere within a 50-mile radius of any property owned or managed by TCG or any of its affiliated entities. In paragraph no. 6 of that Employment Agreement, you agreed that during your employment and after your separation, you would "not, directly or indirectly, solicit or participate in the solicitation" of TCG's associates "for the purpose of inducing them to leave the employ of TCG or to become employed by another entity." Additionally, in paragraph 3 of that Employment Agreement, you further agreed that you would not reveal, disclose or use confidential information of TCG.

It has come to our attention that you have recently gone to work for a competitor of TCG, Mark Spain Real Estate. Additionally, we are aware of several of TCG's former and current associates that you may have solicited to join you at that company. Please be advised that TCG considers its relationships with its employees and customers important business assets. Accordingly, you are directed to refrain from soliciting any of TCG's associates for employment or otherwise breaching your contractual restrictions.



COOLIDGE WALL
———— *A Legal Professional Association*

Jennifer Nelson
May 31, 2024
Page 2

If you fail to do so, TCG may take immediate legal action without further notice to you. TCG would pursue all available claims and remedies in any such litigation, including but not limited to, recovering its attorney's fees pursuant to paragraph no. 13 of the Employment Agreement. You may also be required to repay the consideration you received for that agreement.

If suit becomes necessary, TCG will seek immediate injunctive relief to restrain and enjoin your conduct, as more fully described above. Additionally, TCG will seek all monetary relief deemed appropriate, including compensatory damages. If you choose to defend against that lawsuit, you may need to do so at your own expense. If TCG procures a money judgment against you, all available avenues will be taken to collect that judgment. You are hereby placed on formal notice that any attempt by you to transfer property out of your name at this time will be considered by us to be a fraudulent conveyance, subjecting all those involved to additional liability.

In anticipation of a lawsuit being filed against you, I further demand that you take immediate steps to preserve and avoid spoliation of information that may be relevant to that litigation. I am advising you that as part of the substantial discovery which will take place if a lawsuit becomes necessary, TCG will be requesting any and all documents and information relating to the conduct in question. Documents existing in paper form, including phone messages and logs, calendars, internal memorandum, and other related documents, including all document drafts, will be requested. The discovery requests also will include all electronically created and/or stored information, including but not limited to, emails, voicemails, text messages, instant messages, word processing files, spreadsheets, PDFs, JPEGs, PowerPoint presentations, database files, cookies, and .ZIP files. You are specifically cautioned that you are not to destroy any such documents and electronically stored information, including computers, cell phones, computer hard drives, and computer disks. Furthermore, you are cautioned to take specific steps to preserve that information. You are cautioned to take out of service, secure and retain from using any computers upon which such information may be resident. You are to notify any actual or prospective employers, internet service providers, telephone companies, and any other entity in custody of such information until further notice. All such information must be preserved notwithstanding any policy or practice which you or any other entity may have to the contrary. You are specifically placed on notice that, if there is a failure to preserve such information as requested, TCG will seek additional damages against you and all others involved for spoliation of evidence. Furthermore, an inference may by drawn by the court that the documents and data which you did not preserve contained evidence which was adverse to you.



Jennifer Nelson
May 31, 2024
Page 3

It is our hope that such legal action will not be necessary and that you understand the seriousness of this situation.

This letter is being sent without waiver of any rights or remedies that TCG may have.

David P. Pierce

DPP/kaf
Enclosure

008866\00100\4874-0629-8818.1

# EMPLOYMENT AGREEMENT FORM

This Agreement is entered into between The Connor Group, A Real Estate Investment Firm, LLC 10510 Springboro Pike, Miamisburg, Ohio 45342, (hereinafter "EMPLOYER"), and Jennifer Nelson, (hereinafter "ASSOCIATE"). EMPLOYER hereby agrees to employ and/or continue the employment of ASSOCIATE, subject to the terms and conditions set forth below.

1.      COMPENSATION.  In consideration for such employment and the promises set forth herein, EMPLOYER shall accord to said ASSOCIATE such salary and other benefits as shall from time to time be agreed upon between the parties.

2.      DUTIES.  ASSOCIATE shall utilize their best efforts of performing services for the EMPLOYER as a _____ Manager as well as such other duties as they are from time to time directed to perform.  ASSOCIATE agrees to devote their full time and energy to performing their duties for EMPLOYER in exchange for the compensation they will receive. ASSOCIATE agrees to abide by all of EMPLOYER's rules, policies, procedures, practices, and directives.  ASSOCIATE will do nothing which competes with EMPLOYER or which may cause a conflict of interest with the EMPLOYER.  ASSOCIATE agrees that they will not seek, nor undertake any other employment while in the employ of the EMPLOYER.

3.      CONFIDENTIAL INFORMATION.  It is understood between the parties that, during the term of ASSOCIATE's employment, ASSOCIATE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets relating to the business of EMPLOYER.  Such confidential information, proprietary information, and trade secrets include but are not limited to EMPLOYER's systems, policies, procedures, manuals, forms, seminar materials, financial records, reports, financial plans, contracts, customer lists and information, vendor lists, vendor pricing and information, and marketing/customer retention strategies.  ASSOCIATE expressly covenants and agrees that they will not at any time during their employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for their own benefit or the benefit of others.

4.      EMPLOYER PROPERTY.  ASSOCIATE further agrees that they will not remove from the EMPLOYER'S premises any files, records, reports, manuals, documents, drawings, specifications, equipment or similar items, including any copies, facsimiles, or reproductions thereof, owned by or relating to the business of EMPLOYER, except where required for the performance of ASSOCIATE's duties for EMPLOYER.  All such materials shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of ASSOCIATE from employment.  This paragraph applies to all such materials coming into the possession of ASSOCIATE, including but not limited to materials prepared and produced by ASSOCIATE.

5.      ASSOCIATE COMPETITION.  ASSOCIATE further agrees that, during the term of their employment, and for a period of two years after termination of said employment for any reason, they shall not engage, directly or indirectly, individually or as an agent, associate, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which is engaged in the same or similar business as EMPLOYER or any of its affiliated entities, within a 50 mile radius of any property owned or managed by EMPLOYER or any of its affiliated entities.

6.      SOLICITATION OF ASSOCIATES.  ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of other associates of EMPLOYER for the purpose of inducing them to leave the employ of EMPLOYER or to become employed by another entity.

7.      SOLICITATION OF CUSTOMERS.  ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of any actual or prospective customers or tenants of EMPLOYER for the purposes of inducing them to discontinue doing business with EMPLOYER or for purposes of inducing them to do business with any of EMPLOYER's competitors.  For purposes of this paragraph, a prospective customer or tenant shall include any customer or tenant who has had contact with EMPLOYER for the purposes of potentially becoming a customer or tenant.

8.    SOLICITATION OF INVESTORS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, contact or solicit investors-members or potential investors-members relating to any business or investment opportunities. ASSOCIATE further agrees that during their employment, and after the termination thereof for any reason, they will not disclose information about such investors-members or potential investors-members to any other individual or entity. For purposes of this Paragraph, investors-members and potential investors-members includes any investors-members or potential investors-members that ASSOCIATE became aware of during their employment with EMPLOYER, including but not limited to investors-members or potential investors-members developed through ASSOCIATE'S efforts.

9.    NON-DISPARAGEMENT. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly whether verbally, in writing, by email, over the internet or by any other means whatsoever, make, insinuate or imply any false or negative comments relating to EMPLOYER, or any of its successors, assigns, affiliates, owners, officers and employees, and their respective family members.

10.    REPAYMENT OF OUTSIDE TRAINING COSTS. Should the ASSOCIATE terminate their employment within the first 12 months of their hire date, the ASSOCIATE agrees to reimburse the EMPLOYER for any direct costs incurred for outside training of the ASSOCIATE (outside training defined as seminars or other training programs conducted on the fee-paid basis by organizations other than the EMPLOYER).

11.    EMPLOYER'S RIGHTS. Nothing within this Agreement shall be construed to restrict or modify any rights of EMPLOYER to determine its policies, rules of conduct, and practices, and discipline ASSOCIATE for perceived violations thereof. EMPLOYER shall have absolute discretion in making assignments of work and directing the time and manner of ASSOCIATE's work

12.    SUCCESSORS. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, executors, administrators, successors, and assigns.

13.    ENFORCEMENT. This Agreement shall be enforceable in law or in equity. In the event that this Agreement is breached by ASSOCIATE, EMPLOYER shall be entitled to recover from ASSOCIATE all costs and attorney's fees incurred by EMPLOYER as a result of or arising out of said breach, in addition to all other remedies provided in law or in equity.

14.    GOVERNING LAW. This Agreement shall be construed under the laws of the State of Ohio.

15.    TERMINATION. Notwithstanding anything contained herein, either ASSOCIATE or EMPLOYER may terminate the employment relationship between the parties at any time, and for any reason, with or without notice.

16.    ENTIRE AGREEMENT / MODIFICATION. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements, understandings, promises, and representations made by either party to the other concerning such subject matter. This Agreement may not be modified in any manner except by an instrument in writing signed by both parties. A waiver of any provision of this Agreement in the event of breach thereof shall not constitute a waiver of that or any other provision in the event of any subsequent breach or breaches.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the _____2nd_____ day of March 2020

_____
Witness

_____
Witness

_Jennifer Nelson_
ASSOCIATE

_____
EMPLOYER

Rev. May 21, 2018 SBD



# COOLIDGE WALL
*A Legal Professional Association*

Merle F. Wilberding
J. Stephen Herbert
R. Scott Blackburn
Sam Warwar
Terence L. Fague
Richard A. Talda
David C. Korte
Stephen M. McHugh
Douglas M. Ventura
Kristin A. Finch
David P. Pierce
Shannon L. Costello
Christopher R. Conard
Marc L. Fleischauer
Michelle D. Bach
Gregory M. Ewers
Daniel J. Gentry
R. Michael Osborn
Patricia J. Friesinger
Joshua R. Lounsbury
Michael G. Leesman
W. Chip Herin III
Patrick Martin
Jeffrey A. Winwood
Lu Ann Stanley
Tino M. Monaldo
Edie E. Crump
Dina M. Cary
Erica L. Glass
Benjamin A. Mazer
Robert D. Ballinger
Zachary B. White
Ashley E. Warwar
Elliott V. Heller
Kara T. Ruffolo
Sarah J. Sparks
Jordan P. Staley
Michael J. Ruffolo

J. Bradford Coolidge
1886-1965

Hugh E. Wall, Jr.
1912-2001

Ronald S. Pretekin
1942-2011

Suite 200
33 West First Street
Dayton, Ohio 45402-1289
937-223-8177
Fax: 937-223-6705
www.coollaw.com

Direct Dial Number
937 449 5543

E-mail Address:
Pierce@coollaw.com

May 29, 2024

VIA EMAIL AND REGULAR U.S. MAIL – Tinakay64@yahoo.com

Tina Austin
1793 Walker Ridge Dr. SW
Marietta, GA 30064

Re:     Your Employment Obligations with The Connor Group, A Real Estate
        Investment Firm, LLC

Dear Ms. Austin:

I represent The Connor Group, a Real Estate Investment Firm, LLC ("TCG"), with respect to employment matters. I understand that your employment with TCG recently ended.

The purpose of this letter is to remind you of your continuing obligations to TCG. As a part of and in consideration for your prior employment with TCG, you entered into the attached Employment Agreement. In paragraph no. 5 of that Employment Agreement, you agreed that, during employment with TCG and for a period of two years after your separation from employment, you would not compete with TCG anywhere within a 50-mile radius of any property owned or managed by TCG or any of its affiliated entities. In paragraph no. 6 of that Employment Agreement, you agreed that during your employment and after your separation, you would "not, directly or indirectly, solicit or participate in the solicitation" of TCG's associates "for the purpose of inducing them to leave the employ of TCG or to become employed by another entity." Additionally, in paragraph 3 of that Employment Agreement, you further agreed that you would not reveal, disclose or use confidential information of TCG.

It has come to our attention that you have recently gone to work for a competitor of TCG, Mark Spain Real Estate. Additionally, we are aware of several of TCG's former and current associates that you appear to have solicited to join you at that company. Please be advised that TCG considers its relationships with its employees and customers important business assets. Accordingly, you are directed to refrain from soliciting any of TCG's associates for employment or otherwise breaching your contractual restrictions.

# COOLIDGE WALL
*A Legal Professional Association*

Tina Austin
May 29, 2024
Page 2

If you fail to do so, TCG may take immediate legal action without further notice to you. TCG would pursue all available claims and remedies in any such litigation, including but not limited to, recovering its attorney's fees pursuant to paragraph no. 13 of the Employment Agreement. You may also be required to repay the consideration you received for that agreement.

If suit becomes necessary, TCG will seek immediate injunctive relief to restrain and enjoin your conduct, as more fully described above. Additionally, TCG will seek all monetary relief deemed appropriate, including compensatory damages. If you choose to defend against that lawsuit, you may need to do so at your own expense. If TCG procures a money judgment against you, all available avenues will be taken to collect that judgment. You are hereby placed on formal notice that any attempt by you to transfer property out of your name at this time will be considered by us to be a fraudulent conveyance, subjecting all those involved to additional liability.

In anticipation of a lawsuit being filed against you, I further demand that you take immediate steps to preserve and avoid spoliation of information that may be relevant to that litigation. I am advising you that as part of the substantial discovery which will take place if a lawsuit becomes necessary, TCG will be requesting any and all documents and information relating to the conduct in question. Documents existing in paper form, including phone messages and logs, calendars, internal memorandum, and other related documents, including all document drafts, will be requested. The discovery requests also will include all electronically created and/or stored information, including but not limited to, emails, voicemails, text messages, instant messages, word processing files, spreadsheets, PDFs, JPEGs, PowerPoint presentations, database files, cookies, and .ZIP files. You are specifically cautioned that you are not to destroy any such documents and electronically stored information, including computers, cell phones, computer hard drives, and computer disks. Furthermore, you are cautioned to take specific steps to preserve that information. You are cautioned to take out of service, secure and retain from using any computers upon which such information may be resident. You are to notify any actual or prospective employers, internet service providers, telephone companies, and any other entity in custody of such information until further notice. All such information must be preserved notwithstanding any policy or practice which you or any other entity may have to the contrary. You are specifically placed on notice that, if there is a failure to preserve such information as requested, TCG will seek additional damages against you and all others involved for spoliation of evidence. Furthermore, an inference may by drawn by the court that the documents and data which you did not preserve contained evidence which was adverse to you.



Tina Austin
May 29, 2024
Page 3


It is our hope that such legal action will not be necessary and that you understand the seriousness of this situation.

This letter is being sent without waiver of any rights or remedies that TCG may have.

Very truly yours,

David P. Pierce

DPP/kaf
Enclosure


008866\00100\4866-1354-7203.1

## EMPLOYMENT AGREEMENT

This Agreement is entered into between THE CONNOR GROUP, A REAL ESTATE INVESTMENT FIRM, LLC (hereinafter "EMPLOYER") and ___Tina Austin___ (hereinafter "EMPLOYEE"). EMPLOYER hereby agrees to employ EMPLOYEE, and EMPLOYEE agrees to such employment, subject to the terms and conditions as set forth below.

1.    <u>Compensation and Benefits.</u>    EMPLOYEE shall initially receive such compensation and benefits as offered by EMPLOYER at the time of this Agreement, and thereafter as shall be from time to time determined by EMPLOYER.

2.    <u>EMPLOYEE's Duties.</u>  EMPLOYEE shall perform such duties as shall be from time to time determined by EMPLOYER. EMPLOYEE shall diligently and conscientiously devote his/her full business time, attention and best efforts in discharging his/her duties to the best of his/her ability. EMPLOYEE shall demonstrate belief in and execution of EMPLOYER's core systems, operating beliefs and strategies, and business philosophies. EMPLOYEE shall exercise the foremost dedication and loyalty in the performance of such duties, and shall perform all duties reasonably related to his/her position, as well as such other duties as shall be from time to time directed by EMPLOYER. EMPLOYEE shall not engage in outside employment without prior written consent of EMPLOYER. EMPLOYEE shall abide by all policies, practices, rules, and directives of EMPLOYER in the performance of his/her duties.

3.    <u>Confidential Information.</u>    It is understood between the parties that, during the term of his/her employment, EMPLOYEE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets, relating to the business of EMPLOYER. Such confidential information, proprietary information, and trade secrets include but are not limited to personnel information, tenant and vendor lists and information, training methods, techniques and strategies, marketing and advertising methods, and any and all information concerning EMPLOYER's systems, procedures, manuals, financial records, plans and materials, price lists and information, and pricing methods and strategies. EMPLOYEE expressly covenants and agrees that he/she will not at any time during his/her employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for his/her own benefit or for the benefit of others.

4.    <u>Employee Competition.</u> EMPLOYEE further agrees that, during his/her employment, and for a period of two years after termination of said employment for any reason, he/she shall not engage, directly or indirectly, individually or as an agent, employee, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which competes with EMPLOYER in the acquisition, ownership, operation, management, or sale of residential rental properties, or in any other business of the type conducted, authorized, offered or provided by EMPLOYER or its affiliates. After termination of employment, these restrictions shall apply only (a) within a 25 mile radius of any property where any operations conducted by EMPLOYER or its affiliates were performed, supervised, or assisted in by EMPLOYEE, and (b) within any county where any operations conducted by EMPLOYER or its affiliates were performed, supervised, or assisted in by EMPLOYEE.

5.    <u>Recruiting of Employees.</u>    EMPLOYEE acknowledges that EMPLOYER has a substantial investment in its employees, and that such employees are critical to EMPLOYER's business. Furthermore, EMPLOYEE acknowledges that, during the term of his/her employment, he/she will have access to and become acquainted with confidential information concerning the unique skills, abilities, and qualifications of EMPLOYER's employees. Therefore, EMPLOYEE further agrees that, during his/her employment, and for a period of three years after the termination thereof for any reason, he/she shall not, directly or indirectly, hire or recruit, or participate in the hiring or recruiting of, other employees of

EMPLOYER, for the purposes of inducing them to leave the employ of EMPLOYER or to become employed by another entity. EMPLOYEE further agrees that during his/her employment, and for a period of three years after the termination thereof for any reason, he/she will not disclose information about such employees or recommend such employees to prospective employers. EMPLOYEE further agrees that he/she will not directly or indirectly induce such employees to breach any legal obligations they have to EMPLOYER. EMPLOYEE acknowledges that the provisions contained within this paragraph are of the essence to this Agreement. EMPLOYEE agrees that the damage which EMPLOYER would suffer as a result of breach of these provisions by EMPLOYEE would be irreparable, and incapable of exact ascertainment. Therefore, EMPLOYEE agrees that EMPLOYER shall be entitled to injunctive relief in the event of such breach. Furthermore, all bonuses which otherwise might be payable to EMPLOYEE shall not be paid and shall be forfeited in their entirety. Furthermore, it is expressly understood that one-fifth of EMPLOYEE's salary is being paid as consideration for the provisions of this paragraph. In the event that any court finds any such provisions are unenforceable, in whole or in part, or modifies any such provisions, EMPLOYEE agrees to repay to EMPLOYER all consideration paid for the provisions of this paragraph.

6.    EMPLOYER Property. EMPLOYEE further agrees that he/she will not remove from EMPLOYER's premises any files, records, reports, manuals, documents, drawings, specifications, equipment or similar items, including but not limited to any copies, facsimiles, reproductions or electronically stored information, owned by or relating to the business of EMPLOYER, except where required for the performance of EMPLOYEE's duties for EMPLOYER. All such items shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of EMPLOYEE from employment. This paragraph applies to all such items coming into the possession of EMPLOYEE, including but not limited to materials prepared and produced by EMPLOYEE.

7.    Termination. Notwithstanding anything contained herein, either EMPLOYEE or EMPLOYER may terminate this Agreement, and EMPLOYEE's employment hereunder, at any time, and for any reason, with or without notice. ·

8.    Effect of Termination. Except as otherwise provided herein, termination of this Agreement terminates all obligations of the parties hereunder. Provided, however, it is expressly understood that the rights and obligations of the parties under paragraph nos. 3 through 6 shall survive termination of this Agreement and of EMPLOYEE's employment hereunder.

9.    Enforcement/Interpretation. This Agreement shall be enforceable in law or in equity. In the event that this Agreement is breached by EMPLOYEE, EMPLOYER shall be entitled to recover from EMPLOYEE all costs and attorney's fees incurred by EMPLOYER as a result of or arising out of such breach, in addition to all other remedies provided in law or in equity. This Agreement shall be enforceable by and inure to the benefit of EMPLOYER's affiliates and their successors and assigns. This Agreement shall be construed without regard to the identity of the drafter. This Agreement shall be construed and enforced in accordance with the laws of the State of Georgia, except for any conflicts of law provisions which would require reference to the law of another state. Paragraph nos. 3 through 6 of this Agreement shall be construed, in a manner consistent with their terms, to provide the maximum protection available to EMPLOYER and its affiliates under Georgia law as of the date of this Agreement. The duration of the restraints set forth in paragraph nos. 4 and 5 shall automatically extend for an amount of time equal to the amount of time that violation of such provision has continued. In any action by any party relating to this Agreement or EMPLOYEE's employment, venue shall be proper only in a state or federal court located in Montgomery County, Ohio, except that, for purposes of enforcing paragraph nos. 3 through 6 of this Agreement, venue shall be proper in any county where the EMPLOYER does business, or in any county where EMPLOYEE resides or has conducted the activity giving rise to the claim. If any portion of this Agreement is found to be invalid, illegal, or unenforceable, such shall not affect the validity, legality, or enforceability of the remainder of the Agreement. A court may modify the restrictions in paragraph nos. 3 through 6 of this Agreement to the

maximum extent provided for under Georgia law in order to make such restrictions reasonable.

     10.    <u>Entire Agreement/Modification</u>. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements, understandings, promises, and representations made by either party to the other concerning such subject matter. This Agreement specifically modifies and supercedes any prior employment agreements entered into between the parties. This Agreement may not be modified in any manner except by an instrument in writing signed by both parties. A waiver of any provision of this Agreement in the event of breach thereof shall not constitute a waiver of that or any other provision in the event of any subsequent breach or breaches.

     11.    <u>Term</u>. This Agreement shall be effective commencing on EMPLOYEE's first date of employment, and remain in effect until terminated by either party.

     IN WITNESS WHEREOF, the parties have duly executed this Agreement on this 14th day of January , 2011.

WITNESS:

EMPLOYEE:

_____

_____
(Signature)

_____
(Print Name)

WITNESS:

EMPLOYER:

_____

By: _____
(Signature)

_____    _____
(Print Name)           (Title)

THE CONNOR GROUP, LLC



# COOLIDGE WALL

*A Legal Professional Association*

Merle F. Wilberding
J. Stephen Herbert
R. Scott Blackburn
Sam Warwar
Terence L. Fague
Richard A. Talda
David C. Korte
Stephen M. McHugh
Douglas M. Ventura
Kristin A. Finch
David P. Pierce
Shannon L. Costello
Christopher R. Conard
Marc L. Fleischauer
Michelle D. Bach
Gregory M. Ewers
Daniel J. Gentry
R. Michael Osborn
Patricia J. Friesinger
Joshua R. Lounsbury
Michael G. Leesman
W. Chip Herin III
Patrick Martin
Jeffrey A. Winwood
Lu Ann Stanley
Tino M. Monaldo
Edie E. Crump
Dina M. Cary
Erica L. Glass
Benjamin A. Mazer
Robert D. Ballinger
Zachary B. White
Ashley E. Warwar
Elliott V. Haller
Kara T. Ruffolo
Sarah J. Sparks
Jordan P. Staley
Michael J. Ruffolo

J. Bradford Coolidge
1886-1965

Hugh E. Wall, Jr.
1912-2001

Ronald S. Pretekin
1942-2011

Suite 200
33 West First Street
Dayton, Ohio 45402-1289
937-223-8177
Fax: 937-223-6705
www.coollaw.com

Direct Dial Number
937 449 5543

E-mail Address:
Pierce@coollaw.com

May 29, 2024

VIA EMAIL AND REGULAR U.S. MAIL – kr_jenni@hotmail.com

Jennifer Moreno
6650 17th Way North
St. Petersburg, FL 33702

Re:    Your Employment Obligations with The Connor Group, A Real Estate
       Investment Firm, LLC

Dear Ms. Moreno:

I represent The Connor Group, a Real Estate Investment Firm, LLC ("TCG"), with respect to employment matters. I understand that your employment with TCG recently ended.

The purpose of this letter is to remind you of your continuing obligations to TCG. As a part of and in consideration for your prior employment with TCG, you entered into an Employment Agreement. In paragraph no. 5 of that Employment Agreement, you agreed that, during employment with TCG and for a period of two years after your separation from employment, you would not compete with TCG anywhere within a 50-mile radius of any property owned or managed by TCG or any of its affiliated entities. In paragraph no. 6 of that Employment Agreement, you agreed that during your employment and after your separation, you would "not, directly or indirectly, solicit or participate in the solicitation" of TCG's associates "for the purpose of inducing them to leave the employ of TCG or to become employed by another entity." Additionally, in paragraph 3 of that Employment Agreement, you further agreed that you would not reveal, disclose or use confidential information of TCG.

It has come to our attention that you have recently gone to work for a competitor of TCG, Mark Spain Real Estate. Additionally, we are aware of several of TCG's former and current associates that you appear to have solicited to join you at that company. Please be advised that TCG considers its relationships with its employees and customers important business assets. Accordingly, you are directed to refrain from soliciting any of TCG's associates for employment or otherwise breaching your contractual restrictions.

*Legal Services Since 1853*

# COOLIDGE WALL
*A Legal Professional Association*

Jennifer Moreno
May 29, 2024
Page 2

If you fail to do so, TCG may take immediate legal action without further notice to you. TCG would pursue all available claims and remedies in any such litigation, including but not limited to, recovering its attorney's fees pursuant to paragraph no. 13 of the Employment Agreement. You may also be required to repay the consideration you received for that agreement.

If suit becomes necessary, TCG will seek immediate injunctive relief to restrain and enjoin your conduct, as more fully described above. Additionally, TCG will seek all monetary relief deemed appropriate, including compensatory damages. If you choose to defend against that lawsuit, you may need to do so at your own expense. If TCG procures a money judgment against you, all available avenues will be taken to collect that judgment. You are hereby placed on formal notice that any attempt by you to transfer property out of your name at this time will be considered by us to be a fraudulent conveyance, subjecting all those involved to additional liability.

In anticipation of a lawsuit being filed against you, I further demand that you take immediate steps to preserve and avoid spoliation of information that may be relevant to that litigation. I am advising you that as part of the substantial discovery which will take place if a lawsuit becomes necessary, TCG will be requesting any and all documents and information relating to the conduct in question. Documents existing in paper form, including phone messages and logs, calendars, internal memorandum, and other related documents, including all document drafts, will be requested. The discovery requests also will include all electronically created and/or stored information, including but not limited to, emails, voicemails, text messages, instant messages, word processing files, spreadsheets, PDFs, JPEGs, PowerPoint presentations, database files, cookies, and .ZIP files. You are specifically cautioned that you are not to destroy any such documents and electronically stored information, including computers, cell phones, computer hard drives, and computer disks. Furthermore, you are cautioned to take specific steps to preserve that information. You are cautioned to take out of service, secure and retain from using any computers upon which such information may be resident. You are to notify any actual or prospective employers, internet service providers, telephone companies, and any other entity in custody of such information until further notice. All such information must be preserved notwithstanding any policy or practice which you or any other entity may have to the contrary. You are specifically placed on notice that, if there is a failure to preserve such information as requested, TCG will seek additional damages against you and all others involved for spoliation of evidence. Furthermore, an inference may by drawn by the court that the documents and data which you did not preserve contained evidence which was adverse to you.

# COOLIDGE WALL
*A Legal Professional Association*

Jennifer Moreno
May 29, 2024
Page 3

It is our hope that such legal action will not be necessary and that you understand the seriousness of this situation.

This letter is being sent without waiver of any rights or remedies that TCG may have.

Very truly yours,

David P. Pierce

DPP/kaf

008866\00100\4871-4461-3058.1



Merle F. Wilberding
J. Stephen Herbert
R. Scott Blackburn
Sam Warwar
Terence L. Fague
Richard A. Talda
David C. Korte
Stephen M. McHugh
Douglas M. Ventura
Kristin A. Finch
David P. Pierce
Shannon L. Costello
Christopher R. Conard
Marc L. Fleischauer
Michelle D. Bach
Gregory M. Ewers
Daniel J. Gentry
R. Michael Osborn
Patricia J. Friesinger
Joshua R. Lounsbury
Michael G. Leesman
W. Chip Herin III
Patrick Martin
Jeffrey A. Winwood
Lu Ann Stanley
Tino M. Monaldo
Edie E. Crump
Dina M. Cary
Erica L. Glass
Benjamin A. Mazer
Robert D. Ballinger
Zachary B. White
Ashley E. Warwar
Elliott V. Haller
Kara T. Ruffolo
Sarah J. Sparks
Jordan P. Staley
Michael J. Ruffolo

J. Bradford Coolidge
1886-1965

Hugh E. Wall, Jr.
1912-2001

Ronald S. Pretekin
1942-2011

**COOLIDGE WALL**
*A Legal Professional Association*

Suite 200
33 West First Street
Dayton, Ohio 45402-1289
937-223-8177
Fax: 937-223-6705
www.coollaw.com

Direct Dial Number
937 449 5543

E-mail Address:
Pierce@coollaw.com

May 29, 2024

VIA EMAIL AND REGULAR U.S. MAIL – meganhedrick24@gmail.com

Megan Hedrick
8644 Tessara Lane
Tampa, FL 33647

Re:     Your Employment Obligations with The Connor Group, A Real Estate
        Investment Firm, LLC

Dear Ms. Hedrick:

I represent The Connor Group, a Real Estate Investment Firm, LLC ("TCG"), with respect to employment matters. I understand that your employment with TCG recently ended.

The purpose of this letter is to remind you of your continuing obligations to TCG. As a part of and in consideration for your prior employment with TCG, you entered into the attached Employment Agreement. In paragraph no. 5 of that Employment Agreement, you agreed that, during employment with TCG and for a period of two years after your separation from employment, you would not compete with TCG anywhere within a 50-mile radius of any property owned or managed by TCG or any of its affiliated entities. In paragraph no. 6 of that Employment Agreement, you agreed that during your employment and after your separation, you would "not, directly or indirectly, solicit or participate in the solicitation" of TCG's associates "for the purpose of inducing them to leave the employ of TCG or to become employed by another entity." Additionally, in paragraph 3 of that Employment Agreement, you further agreed that you would not reveal, disclose or use confidential information of TCG.

It has come to our attention that you have recently gone to work for a competitor of TCG, Mark Spain Real Estate. Additionally, we are aware of several of TCG's former and current associates that you may have solicited to join you at that company. Please be advised that TCG considers its relationships with its employees and customers important business assets. Accordingly, you are directed to refrain from soliciting any of TCG's associates for employment or otherwise breaching your contractual restrictions.



COOLIDGE WALL
*A Legal Professional Association*

Megan Hedrick
May 29, 2024
Page 2

If you fail to do so, TCG may take immediate legal action without further notice to you. TCG would pursue all available claims and remedies in any such litigation, including but not limited to, recovering its attorney's fees pursuant to paragraph no. 13 of the Employment Agreement. You may also be required to repay the consideration you received for that agreement.

If suit becomes necessary, TCG will seek immediate injunctive relief to restrain and enjoin your conduct, as more fully described above. Additionally, TCG will seek all monetary relief deemed appropriate, including compensatory damages. If you choose to defend against that lawsuit, you may need to do so at your own expense. If TCG procures a money judgment against you, all available avenues will be taken to collect that judgment. You are hereby placed on formal notice that any attempt by you to transfer property out of your name at this time will be considered by us to be a fraudulent conveyance, subjecting all those involved to additional liability.

In anticipation of a lawsuit being filed against you, I further demand that you take immediate steps to preserve and avoid spoliation of information that may be relevant to that litigation. I am advising you that as part of the substantial discovery which will take place if a lawsuit becomes necessary, TCG will be requesting any and all documents and information relating to the conduct in question. Documents existing in paper form, including phone messages and logs, calendars, internal memorandum, and other related documents, including all document drafts, will be requested. The discovery requests also will include all electronically created and/or stored information, including but not limited to, emails, voicemails, text messages, instant messages, word processing files, spreadsheets, PDFs, JPEGs, PowerPoint presentations, database files, cookies, and .ZIP files. You are specifically cautioned that you are not to destroy any such documents and electronically stored information, including computers, cell phones, computer hard drives, and computer disks. Furthermore, you are cautioned to take specific steps to preserve that information. You are cautioned to take out of service, secure and retain from using any computers upon which such information may be resident. You are to notify any actual or prospective employers, internet service providers, telephone companies, and any other entity in custody of such information until further notice. All such information must be preserved notwithstanding any policy or practice which you or any other entity may have to the contrary. You are specifically placed on notice that, if there is a failure to preserve such information as requested, TCG will seek additional damages against you and all others involved for spoliation of evidence. Furthermore, an inference may by drawn by the court that the documents and data which you did not preserve contained evidence which was adverse to you.



Megan Hedrick
May 29, 2024
Page 3

It is our hope that such legal action will not be necessary and that you understand the seriousness of this situation.

This letter is being sent without waiver of any rights or remedies that TCG may have.

Very truly yours,

David P. Pierce

DPP/kaf
Enclosure

008866\00100\4857-8222-2787.1

# EMPLOYMENT AGREEMENT FORM

This Agreement is entered into between <u>The Connor Group, A Real Estate Investment Firm, LLC</u> 10510 Springboro Pike, Miamisburg, Ohio 45342, (hereinafter "EMPLOYER"), and _Connor Medina_ , (hereinafter "ASSOCIATE"). EMPLOYER hereby agrees to employ and/or continue the employment of ASSOCIATE, subject to the terms and conditions set forth below.

1.     COMPENSATION. In consideration for such employment and the promises set forth herein, EMPLOYER shall accord to said ASSOCIATE such salary and other benefits as shall from time to time be agreed upon between the parties.

2.     DUTIES. ASSOCIATE shall utilize their best efforts of performing services for the EMPLOYER as a _____ _Property manager_ as well as such other duties as they are from time to time directed to perform. ASSOCIATE agrees to devote their full time and energy to performing their duties for EMPLOYER in exchange for the compensation they will receive. ASSOCIATE agrees to abide by all of EMPLOYER's rules, policies, procedures, practices, and directives. ASSOCIATE will do nothing which competes with EMPLOYER or which may cause a conflict of interest with the EMPLOYER. ASSOCIATE agrees that they will not seek, nor undertake any other employment while in the employ of the EMPLOYER.

3.     CONFIDENTIAL INFORMATION. It is understood between the parties that, during the term of ASSOCIATE's employment, ASSOCIATE will have access to and become acquainted with certain confidential information, proprietary information, and trade secrets relating to the business of EMPLOYER. Such confidential information, proprietary information, and trade secrets include but are not limited to EMPLOYER's systems, policies, procedures, manuals, forms, seminar materials, financial records, reports, financial plans, contracts, customer lists and information, vendor lists, vendor pricing and information, and marketing/customer retention strategies. ASSOCIATE expressly covenants and agrees that they will not at any time during their employment, or after the termination thereof for any reason, either directly or indirectly, reveal, divulge, or make known to any person, corporation, firm or entity, any such information, or use such information, either for their own benefit or the benefit of others.

4.     EMPLOYER PROPERTY. ASSOCIATE further agrees that they will not remove from the EMPLOYER'S premises any files, records, reports, manuals, documents, specifications, equipment or similar items, including any copies, facsimiles, or reproductions thereof, owned by or relating to the business of EMPLOYER, except where required for the performance of ASSOCIATE'S duties for EMPLOYER. All such materials shall be returned to EMPLOYER in a timely fashion, and in any event, upon separation of ASSOCIATE from employment. This paragraph applies to all such materials coming into the possession of ASSOCIATE, including but not limited to materials prepared and produced by ASSOCIATE.

5.     ASSOCIATE COMPETITION. ASSOCIATE further agrees that, during the term of their employment, and for a period of two years after termination of said employment for any reason, they shall not engage, directly or indirectly, individually or as an agent, associate, officer, director, shareholder, partner, or in any other capacity whatsoever, in any business which is engaged in the same or similar business as EMPLOYER or any of its affiliated entities, within a 50 mile radius of any property owned or managed by EMPLOYER or any of its affiliated entities.

6.     SOLICITATION OF ASSOCIATES. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of other associates of EMPLOYER for the purpose of inducing them to leave the employ of EMPLOYER or to become employed by another entity.

7.     SOLICITATION OF CUSTOMERS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, solicit or participate in the solicitation of any actual or prospective customers or tenants of EMPLOYER for the purposes of inducing them to discontinue doing business with EMPLOYER or for purposes of inducing them to do business with any of EMPLOYER's competitors. For purposes of this paragraph, a prospective customer or tenant shall include any customer or tenant who has had contact with EMPLOYER for the purposes of potentially becoming a customer or tenant.

8.     SOLICITATION OF INVESTORS. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly, contact or solicit investors-members or potential investors-members relating to any business or investment opportunities. ASSOCIATE further agrees that during their employment, and after the termination thereof for any reason, they will not disclose information about such investors-members or potential investors-members to any other individual or entity. For purposes of this Paragraph, investors-members and potential investors-members includes any investors-members or potential investors-members that ASSOCIATE became aware of during their employment with EMPLOYER, including but not limited to investors-members or potential investors-members developed through ASSOCIATE'S efforts.

9.     NON-DISPARAGEMENT. ASSOCIATE further agrees that, during the term of their employment, and after the termination thereof for any reason, they shall not, directly or indirectly whether verbally, in writing, by email, over the internet or by any other means whatsoever, make, insinuate or imply any false or negative comments relating to EMPLOYER, or any of its successors, assigns, affiliates, owners, officers and employees, and their respective family members.

10.     REPAYMENT OF OUTSIDE TRAINING COSTS. Should the ASSOCIATE terminate their employment within the first 12 months of their hire date, the ASSOCIATE agrees to reimburse the EMPLOYER for any direct costs incurred for outside training of the ASSOCIATE (outside training defined as seminars or other training programs conducted on the fee-paid basis by organizations other than the EMPLOYER).

11.     EMPLOYER'S RIGHTS. Nothing within this Agreement shall be construed to restrict or modify any rights of EMPLOYER to determine its policies, rules of conduct, and practices, and discipline ASSOCIATE for perceived violations thereof. EMPLOYER shall have absolute discretion in making assignments of work and directing the time and manner of ASSOCIATE's work

12.     SUCCESSORS. This Agreement shall be binding upon, and inure to the benefit of, the parties hereto, their heirs, executors, administrators, successors, and assigns.

13.     ENFORCEMENT. This Agreement shall be enforceable in law or in equity. In the event that this Agreement is breached by ASSOCIATE, EMPLOYER shall be entitled to recover from ASSOCIATE all costs and attorney's fees incurred by EMPLOYER as a result of or arising out of said breach, in addition to all other remedies provided in law or in equity.

14.     GOVERNING LAW. This Agreement shall be construed under the laws of the State of Ohio.

15.     TERMINATION. Notwithstanding anything contained herein, either ASSOCIATE or EMPLOYER may terminate the employment relationship between the parties at any time, and for any reason, with or without notice.

16.     ENTIRE AGREEMENT / MODIFICATION. This Agreement constitutes the entire agreement between the parties hereto with respect to the subject matter hereof, and supersedes any and all prior agreements, understandings, promises, and representations made by either party to the other concerning such subject matter. This Agreement may not be modified in any manner except by an instrument in writing signed by both parties. A waiver of any provision of this Agreement in the event of breach thereof shall not constitute a waiver of that or any other provision in the event of any subsequent breach or breaches.

IN WITNESS WHEREOF, the parties have duly executed this Agreement on the _first_ day of _December_ 2020.

_megan Hedrick_
Witness

_Megan Hedrick_
ASSOCIATE

Witness

EMPLOYER

Rev. May 21, 2018 SED



# COOLIDGE WALL
*A Legal Professional Association*

Merle F. Wilberding
J. Stephen Herbert
R. Scott Blackburn
Sam Warwar
Terence L. Fague
Richard A. Talda
David C. Korte
Stephen M. McHugh
Douglas M. Ventura
Kristin A. Finch
David P. Pierce
Shannon L. Costello
Christopher R. Conard
Marc L. Fleischauer
Michelle D. Bach
Gregory M. Ewers
Daniel J. Gentry
R. Michael Osborn
Patricia J. Friesinger
Joshua R. Lounsbury
Michael G. Leesman
W. Chip Herin III
Patrick Martin
Jeffrey A. Winwood
Lu Ann Stanley
Tino M. Monaldo
Edie E. Crump
Dina M. Cary
Erica L. Glass
Benjamin A. Mazer
Robert D. Ballinger
Zachary B. White
Ashley E. Warwar
Elliott V. Haller
Kara T. Ruffolo
Sarah J. Sparks
Jordan P. Staley
Michael J. Ruffolo

J. Bradford Coolidge
1886-1965

Hugh E. Wall, Jr.
1912-2001

Ronald S. Pretekin
1942-2011

Suite 200
33 West First Street
Dayton, Ohio 45402-1289
937-223-8177
Fax: 937-223-6705
www.coollaw.com

Direct Dial Number
937 449 5543

E-mail Address:
Pierce@coollaw.com

May 29, 2024

## VIA UPS UNISHIPPERS AND REGULAR U.S. MAIL

Mark Spain Real Estate
4902 Eisenhower Blvd. S. #296
Tampa, FL  33634

Mark Spain Real Estate
217 Roswell Street, Suite 100
Alpharetta, GA. 30009

## LEGAL NOTICE: PLEASE READ CAREFULLY

Re:     Our Client :   The Connor Group, A Real Estate Investment Firm, LLC
        Matter    :   Jennifer Moreno, Jennifer Nelson, Megan Hedrick, Tina
                      Austin, and Mark Vo

Dear Sir/Madam:

Jennifer Moreno, Jennifer Nelson, Megan Hedrick Tina Austin, and Mark Vo, five of The Connor Group's former, or current, employees (the "Employees") have resigned and are now believed to be working, or planning to work, for Mark Spain Real Estate in either Tampa, Florida or Atlanta, Georgia.

As a part of and in consideration of the Employees' prior employment with The Connor Group, they entered into an Employment Agreement.  In paragraph no. 5 of that Employment Agreement, the Employees agreed that, during any period of employment with The Connor Group and for a period of two years after their separation from employment, they would not compete with The Connor Group anywhere within a 50-mile radius of any property owned or managed by The Connor Group or any of its affiliated entities.  The identity of such properties can be easily located on The Connor Group website at www.theconnorgrp.com/communities.aspx and includes property located in Tampa, Florida and Atlanta, Georgia.  In paragraph no. 6 of that Employment Agreement, the Employees further agreed that, during their employment and after their separation, they would "not, directly or indirectly, solicit or participate in the solicitation" of The Connor

**Exhibit 3**

*Legal Services Since 1853*



COOLIDGE WALL
—————— *A Legal Professional Association*

Mark Spain Real Estate
May 29, 2024
Page 2

Group's associates "for the purpose of inducing them to leave the employ of [The Connor Group] or to become employed by another entity." In paragraph no. 3 of that Employment Agreement, the Employees further agreed that they would not reveal, disclose or use confidential information of The Connor Group.

It is our position that the Employees are contractually and legally obligated to refrain from any such activity, as well as other activities set forth in their Employment Agreements. As I am sure you are aware, Mark Spain Real Estate could be held liable for tortiously interfering with these employment contracts. Furthermore, Mark Spain Real Estate can be held financially liable for wrongful actions of its agents for tortious interference with The Connor Group's business relationships, conversion of confidential information, and a variety of related claims.

Nonetheless, it is not The Connor Group's desire to become involved in litigation with Mark Spain Real Estate. The Connor Group would prefer to deal with this issue on a business level, rather than in the courts. The Connor Group's only interest is to protect itself from unfair competition. Therefore, I am asking for your assistance in making sure that the Employees honor their contractual and legal obligations to The Connor Group. I am sure that you would want nothing less from any former employees, and that you would not want The Connor Group to hire any of Mark Spain Real Estate's employees in violation of their contractual and legal commitments to your company. In fact, both The Connor Group and Mark Spain Real Estate have an interest in making sure that their respective employees abide by agreements such as the one the Employees entered into with The Connor Group. At this time, we are requesting that Mark Spain Real Estate take all appropriate steps to assure that the Employees honor their contractual and legal obligations to The Connor Group.

If the Employees continue to work for Mark Spain Real Estate in Tampa, Atlanta, or anywhere within a 50-mile radius of any property owned or managed by The Connor Group or any of its affiliated entities, The Connor Group will be left with no alternative but legal action, including filing a lawsuit against the Employees and/or those individuals at Mark Spain Real Estate who are participating with the Employees in their conduct. If a lawsuit becomes necessary, The Connor Group may seek an immediate restraining order barring the Employees from any further solicitation and competitive activity in violation of their Employment Agreements with The Connor Group. Additionally, The Connor Group will seek money damages. Punitive damages and attorney's fees will be sought as well.

In anticipation of a lawsuit being filed against you, I further demand that you take immediate steps to preserve and avoid spoliation of information that may be relevant to



Mark Spain Real Estate
May 29, 2024
Page 3

that litigation. I am advising you that as part of the substantial discovery which will take place if a lawsuit becomes necessary, TCG will be requesting any and all documents and information relating to the conduct in question. Documents existing in paper form, including phone messages and logs, calendars, internal memorandum, and other related documents, including all document drafts, will be requested. The discovery requests also will include all electronically created and/or stored information, including but not limited to, emails, voicemails, text messages, instant messages, word processing files, spreadsheets, PDFs, JPEGs, PowerPoint presentations, database files, cookies, and .ZIP files. You are specifically cautioned that you are not to destroy any such documents and electronically stored information, including computers, cell phones, computer hard drives, and computer disks. Furthermore, you are cautioned to take specific steps to preserve that information. You are cautioned to take out of service, secure and retain from using any computers upon which such information may be resident. You are to notify any actual or prospective employers, internet service providers, telephone companies, and any other entity in custody of such information until further notice. All such information must be preserved notwithstanding any policy or practice which you or any other entity may have to the contrary. You are specifically placed on notice that, if there is a failure to preserve such information as requested, TCG will seek additional damages against you and all others involved for spoliation of evidence. Furthermore, an inference may by drawn by the court that the documents and data which you did not preserve contained evidence which was adverse to you.

I am hopeful that this issue can be resolved on a business level, rather than through litigation. If you think it would be beneficial, please contact me to discuss this matter. Otherwise, I hope that you understand the seriousness of this situation, and that Mark Spain Real Estate will guide its conduct and that of the Employees accordingly.

Very truly yours,

David P. Pierce

DPP/kaf

008866\00100\4893-0524-2051.1

**Kathy Fourman**

| | |
|---|---|
| **From:** | UPS <pkginfo@ups.com> |
| **Sent:** | Friday, May 31, 2024 9:47 AM |
| **To:** | Kathy Fourman |
| **Subject:** | UPS Delivery Notification, Tracking Number 1ZX873420199418685 |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |



### Hello, your package has been delivered.

**Delivery Date:**  Friday, 05/31/2024
**Delivery Time:**   9:44 AM
**Signed by:**   MARK SPAIN

### COOLIDGE WALL

**Tracking Number:**          1ZX873420199418685

**Ship To:**          MARK SPAIN REAL ESTATE
217 ROSWELL STREET, SUITE 100
ALPHARETTA, GA 30009
US

**Number of Packages:**          1
**UPS Service:**          UPS Next Day Air®
**Package Weight:**          0.5 LBS
**Reference Number:**          DPP

### Discover more about UPS:
Visit www.ups.com
Sign Up For Additional E-Mail From UPS
Read Compass Online

© 2024 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved.

All trademarks, trade names, or service marks that appear in connection with UPS's services are the property of their respective owners.

Please do not reply directly to this email. UPS will not receive any reply message.

**Review the UPS Privacy Notice**

**For Questions, Visit Our Help and Support Center**

**Kathy Fourman**

| | |
|---|---|
| **From:** | UPS <pkginfo@ups.com> |
| **Sent:** | Friday, May 31, 2024 9:56 AM |
| **To:** | Kathy Fourman |
| **Subject:** | UPS Delivery Notification, Tracking Number 1ZX873420190055520 |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |



### Hello, your package has been delivered.

**Delivery Date:**  Friday, 05/31/2024
**Delivery Time:**  9:53 AM
**Signed by:**  SELBIE

### COOLIDGE WALL

| | |
|---|---|
| **Tracking Number:** | **1ZX873420190055520** |
| **Ship To:** | MARK SPAIN REAL ESTATE<br>STE 296<br>4902 EISENHOWER BLVD<br>TAMPA, FL 33634<br>US |
| **Number of Packages:** | 1 |
| **UPS Service:** | UPS Next Day Air® |
| **Package Weight:** | 0.5 LBS |
| **Reference Number:** | DPP |

### Discover more about UPS:

Visit www.ups.com
Sign Up For Additional E-Mail From UPS
Read Compass Online

© 2024 United Parcel Service of America, Inc. UPS, the UPS brandmark, and the color brown are trademarks of United Parcel Service of America, Inc. All rights reserved.

All trademarks, trade names, or service marks that appear in connection with UPS's services are the property of their respective owners.

Please do not reply directly to this email. UPS will not receive any reply message.

**Review the UPS Privacy Notice**

**For Questions, Visit Our Help and Support Center**